UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LEONIDES VIVAS CHACON | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Civil Action No. |
| v. | ) | 05cv10465-MEL |
| | ) | |
| BRUCE CHADBOURNE, FIELD OFFICE | ) | |
| DIRECTOR, BUREAU OF IMMIGRATION | ) | |
| AND CUSTOMS ENFORCEMENT | ) | |
| | ) | |
| Respondent[1] | ) | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER CASE
TO FIRST CIRCUIT COURT OF APPEALS PURSUANT TO
<u>SECTION 106(c) OF THE REAL ID ACT OF 2005</u>

Respondent moves to transfer this action to the First

Circuit Court of Appeals pursuant to the command of section

106(c) of the REAL ID Act of 2005, H.R. 1268, 109th Cong. (2005),

Pub. L. No. 109-13, Div. B, 119 Stat. 231 ("RIDA").[2]  The RIDA

was enacted into law on May 11, 2005.  <u>See</u> Attachment A.

---

[1] The responsive official of the Department of Homeland Security
responsible for enforcement of petitioner's deportation order in
the instant action is Bruce Chadbourne, Field Office Director for
Detention and Removal, Department of Homeland Security, Bureau of
Immigration and Customs Enforcement ("ICE") in Boston,
Massachusetts. <u>See</u> 28 U.S.C. § 517 (providing for the appearance
of the Department of Justice "to attend to the interests of the
United States in a suit pending in a court of the United
States").

[2] <u>See</u> the Emergency Supplemental Appropriations Act for Defense,
the Global War on Terror, and Tsunami Relief, 2005, (H.R. 1268),
which includes the REAL ID Act of 2005, Division B of Title VII

**ARGUMENT**

I. THE COURT SHOULD TRANSFER THIS ACTION TO THE FIRST CIRCUIT
   COURT OF APPEALS AS DIRECTED BY RIDA SECTION 106(c).

Through various sections of the RIDA Congress has amended
the judicial review provisions of the Immigration and Nationality
Act ("INA") to now explicitly provide that all review of removal
orders is exclusively in the appropriate United States Circuit
Courts of Appeals, even for aliens who have criminally-based
removal orders, and that no court has any jurisdiction to review
such removal orders[3] other than as provided by statute at the
circuit court of appeals.

As an immediate application of the RIDA judicial review
amendments, Congress has additionally provided in section 106(c)
of RIDA that for all habeas corpus actions challenging orders of
removal that are pending on the date of RIDA enactment, "the

---

of H.R. 1268, 109th Cong. (2005), Pub. L. No. 109-13, Div. B, 119
Stat. 231.

[3] RIDA section 106(a)(1)(B) creates new INA section 242(a)(5), 8
U.S.C. § 1252(a)(5):

(5) EXCLUSIVE MEANS OF REVIEW- Notwithstanding any other
provision of law (statutory or nonstatutory), including
section 2241 of title 28, United States Code, or any other habeas
corpus provision, and sections 1361 and 1651 of such title, a
petition for review filed with an appropriate court of appeals in
accordance with this section shall be the sole and exclusive
means for judicial review of an order of removal entered or
issued under any provision of this Act, except as provided in
subsection (e). For purposes of this Act, in every provision that
limits or eliminates judicial review or jurisdiction to review,
the terms `judicial review' and `jurisdiction to review' include
habeas corpus review pursuant to section 2241 of title 28, United
States Code, or any other habeas corpus provision, sections 1361

district court shall transfer the case (or the part of the case
that challenges the order of removal, deportation, or exclusion)
to the court of appeals . . ."[4]  Petitioner's habeas case has
been pending in the District Court since March 10, 2005, and
transfer to the First Circuit Court of Appeals is appropriate
because proceedings before the Immigration Judge were completed
in Boston, Massachusetts.[5]

Additionally, on June 16, 2005, the Board of Immigration
Appeals ("BIA") dismissed petitioner's appeal from the
Immigration Judge's denial of petitioner's motion to reopen.  See
Attachment B.  If petitioner seeks judicial review of that

---

and 1651 of such title, and review pursuant to any other
provision of law (statutory or nonstatutory).

[4] 106(c) TRANSFER OF CASES.-
Transfer of Cases- If an alien's case, brought under section 2241
of title 28, United States Code, and challenging a final
administrative order of removal, deportation, or exclusion, is
pending in a district court on the date of the enactment of this
division, then the district court shall transfer the case (or the
part of the case that challenges the order of removal,
deportation, or exclusion) to the court of appeals for the
circuit in which a petition for review could have been properly
filed under section 242(b)(2) of the Immigration and Nationality
Act (8 U.S.C. 1252), as amended by this section, or under section
309(c)(4)(D) of the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996 (8 U.S.C. 1101 note). The court of
appeals shall treat the transferred case as if it had been filed
pursuant to a petition for review under such section 242, except
that subsection (b)(1) of such section shall not apply.

[5] See 8 U.S.C. § 1252(b)(2) (prescribing venue in review of a
removal order, "[t]he petition for review shall be filed with the
court of appeals for the judicial circuit in which the
immigration judge completed the proceedings.").

decision he must file a petition for review at the First Circuit Court of Appeals within 30 days of the date of the BIA decision.[6]

The directed transfer of pending habeas cases to the circuit court complements a concomitant RIDA amendment explicitly providing for subject matter jurisdiction in the circuit courts for judicial review of even criminally-based removal orders. Prior to the RIDA amendments, circuit courts had determined that the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(C) for judicial review effectively kept criminally-based deportation and removal cases from being reviewed at the circuit except for threshold jurisdictional questions. See e.g. Sousa v. INA, 226 F.3d 28, 31 (1st Cir. 2000) ("INA section 242(a)(2)(C) is not a bar to our considering Sousa's claim that he is not removable as an aggravated felon.").

The result was that petitioners with such criminally-based removal orders sought habeas corpus review of their cases in the district courts where possible, because it was held that the absence of an explicit reference to habeas corpus jurisdiction under 28 U.S.C. § 2241 in prior Congressional efforts to limit judicial review was ineffective to restrict such habeas corpus review. See e.g. Goncalves v. Reno, et al., 144 F.3d 110, 120 (1st Cir. 1998), cert. denied 526 U.S. 1004, ("any repeal of the federal courts' historic habeas jurisdiction must be explicit and

---

[6] The automatic administrative stay that was in effect pending determination of petitioner's appeal to the BIA expired upon the June 16, 2005, issuance of the BIA dismissal.

make express reference specifically to the statute granting jurisdiction."); <u>Mahadeo v. Reno, et al.</u>, 226 F.3d 3, 10 (1st Cir. 2000) (pre-RIDA judicial review provisions for removal orders "lack the clear statement of the congressional intent necessary to eliminate habeas review."). Also, the absence of any other forum for review of criminally-based removal orders was a factor in court determinations that pre-RIDA judicial review provisions did not repeal habeas corpus review of removal orders by implication. <u>INS v. St. Cyr</u>, 533 U.S. 289, 314 (2001).

However, through RIDA Congress has at once now unambiguously indicated its intent to eliminate habeas corpus review of removal orders, <u>see</u> Argument, Part II, <u>infra</u>, and at the same time indicated its intent to provide judicial review for even criminally-based orders in the circuit courts of appeals. RIDA section 106(a)(1)(A)(iii) has now created a new section of the INA, section 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D),[7] that explicitly provides for a review for criminally-based removal cases in the circuit court, <u>viz.</u>, "review of constitutional

---

[7] RIDA Section 106(a)(1)(A)(iii) creates new INA section 242(a)(2)(D):

JUDICIAL REVIEW OF CERTAIN LEGAL CLAIMS.- Nothing in subparagraph (B) or (C) [<u>i.e.</u>, INA sections 242(a)(2)(B) and (C), 8 U.S.C. §§ 1252(a)(2)(B) and (C)], or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

claims or questions of law". Cf. Carranza v. INS, 277 F.3d 65, 71 (1st Cir. 2002) (federal courts "retain subject matter jurisdiction over habeas petitions brought by aliens facing removal to the extent those petitions are based on colorable claims of legal error, that is, colorable claims that an alien's statutory or constitutional rights have been violated.").[8] See also Fernandez-Ruiz v. Gonzalez, --- F.3d --- (9th Cir. 2005) (2005 WL 1301593, *1) ("By this [RIDA] amendment, Congress restored judicial review of constitutional claims and questions of law presented in petitions for review of final removal orders.").

Moreover, cases pending on the date of enactment of RIDA that are transferred to the court of appeals as if "filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section shall not apply."[9]

Accordingly, this Court should transfer this action to the First Circuit Court of Appeals pursuant to the direction of RIDA section 106(c).

---

[8] See Conference Report, 151 Cong. Rec. H2813, 2873, 109th Cong., 1st Sess., available at 2005 WL 1025891 (May 3, 2005)("Under the amendments in section 106, all aliens will get review in the same forum -- the courts of appeal.").

[9] INA section 242(b)(1), 8 U.S.C. § 1252(b)(1), is the requirement that judicial review petitions to the circuit courts be filed within 30 days of the date of a final order of removal, and so habeas cases transferred to the circuit court under RIDA section 106(c) are essentially forgiven what otherwise could be a statutory jurisdictional time bar in some cases.

II.   THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION OVER
      PETITIONER'S CLAIMS UNDER THE RIDA AMENDMENTS.

      The RIDA's explicit elimination of subject matter

jurisdiction under 28 U.S.C. § 2241 read with RIDA's explicit

provision for "review of constitutional claims or questions of

law" for all aliens upon properly filed petitions for review at

the circuit court, is now congruent with the Supreme Court's

recognition that "Congress could without raising any

constitutional questions, provide an adequate substitute [to

section 2241] through the courts of appeal." INS v. St. Cyr, 533

U.S. 289, 314 n.38 (2001). See also Swain v. Pressley, 430 U.S.

373, 381 (1977) ("[T]he substitution of a collateral remedy which

is neither inadequate nor ineffective to test the legality of a

person's detention" does not violate the Suspension Clause.).[10]

      Additionally, RIDA amends INA section 242(b)(9),[11] 8 U.S.C.

§ 1252(b)(9), and INA section 242(g),[12] 8 U.S.C. § 1252(b)(g), to

_____

[10] Habeas challenges to pure detention -- that is, challenges
only as to the fact of detention or continuing detention and not
vicariously to the lawfulness of a removal order -- are not
affected by the RIDA section 106 jurisdictional amendments. See
Conference Report, 151 Cong. Rec. H2813, 2873, 109th Cong., 1st
Sess., available at 2005 WL 1025891 (May 3, 2005)("Moreover,
section 106 would not preclude habeas review over challenges to
detention that are independent of challenges to removal
orders.").

[11] Amendments made by Section 106(a)(2) RIDA to INA section
242(b)(9):

242(b)(9) CONSOLIDATION OF QUESTIONS FOR JUDICIAL REVIEW.-
Judicial review of all questions of law and fact, including
interpretation and application of constitutional and statutory
provisions, arising from any action taken or proceeding brought

explicitly include 28 U.S.C. § 2241, inter alia, within the express terms of those statutory jurisdictional review bars. The sum and substance of these amendments is to make explicit that no court other than the court of appeals as provided by statute now has any subject matter jurisdiction respecting "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States", and respecting "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute

---

to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section. *Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.*

(Amended language emphasized).

[12] Amendments made by Section 106(a)(3) RIDA to INA section 242(g):

242(g) EXCLUSIVE JURISDICTION.--Except as provided in this section and notwithstanding any other provision of law *(statutory or nonstatutory) including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title,* no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

(Amended language emphasized).

removal orders against any alien under this [INA]".  INA sections 242(b)(9) and 242(g), respectively, as amended by RIDA.

The effective date for these RIDA judicial review amendments provides that the provisions "shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of enactment of this division [The Real ID Act of 2005]."[13]

## CONCLUSION

Accordingly, under the RIDA amendments to the INA the Court lacks subject matter jurisdiction over the petition, and this case should be transferred to the First Circuit Court of Appeals pursuant to the statutory command of section 106(c) of the RIDA.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  s/Frank Crowley
     FRANK CROWLEY
     Special Assistant U.S. Attorney
     Department of Homeland Security
     P.O. Box 8728
     J.F.K. Station
     Boston, MA 02114
     (617) 565-2415

---

[13] RIDA section 106(b) provides for the effective dates of the RIDA section 106(a) amendments:

106(b) EFFECTIVE DATE.- The amendments made by subsection [RIDA 106] (a) shall take effect upon the date of enactment of this division and shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of enactment of this division.

**CERTIFICATE OF SERVICE**

I hereby certify that I caused true copy of the above document to be served upon counsel for petitioner by mail on June 22, 2005.


s/Frank Crowley
FRANK CROWLEY
Special Assistant U.S. Attorney
Department of Homeland Security
P.O. Box 8728
J.F.K. Station
Boston, MA 02114

ATTACHMENT A

# One Hundred Ninth Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Tuesday,*
*the fourth day of January, two thousand and five*

## An Act

Making Emergency Supplemental Appropriations for Defense, the Global War on Terror, and Tsunami Relief, for the fiscal year ending September 30, 2005, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

Title I—Defense Related Appropriations
Title II—International Programs and Assistance for Reconstruction and the War on Terror
Title III—Domestic Appropriations for the War on Terror
Title IV—Indian Ocean Tsunami Relief
Title V—Other Emergency Appropriations
Title VI—General Provisions and Technical Corrections

DIVISION B—REAL ID ACT OF 2005

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

# DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT FOR DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2005, and for other purposes, namely:

H. R. 1268—72

USE OF FUNDS FOR EMERGENCY PREPAREDNESS CENTERS

SEC. 6078. Section 114 of title I of division I of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by inserting before the period "and section 303 of Public Law 108–422".

COLLECTIONS DEPOSITED INTO PROJECT CONSTRUCTION ACCOUNTS

SEC. 6079. Section 117 of title I of division I of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by striking "that are deposited into the Medical Care Collections Fund may be transferred and merged with" and inserting "may be deposited into the".

CONTRACTS FOR HOSPITAL CARE AND MEDICAL SERVICES

SEC. 6080. Section 1703(d)(2) of title 38, United States Code, is amended by striking "shall be available for the purposes" and inserting "shall be available, without fiscal year limitation, for the purposes".

IMPLEMENTATION OF MISSION CHANGES AT SPECIFIC VETERANS HEALTH ADMINISTRATION FACILITIES

SEC. 6081. (a) IN GENERAL.—Section 414 of the Veterans Health Programs Improvement Act of 2004, is amended by adding at the end the following:

"(h) DEFINITION.—In this section, the term 'medical center' includes any outpatient clinic.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the Veterans Health Programs Improvement Act of 2004 (Public Law 108–422).

This division may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005".

# DIVISION B—REAL ID ACT OF 2005

SECTION 1. SHORT TITLE.

This division may be cited as the "REAL ID Act of 2005".

# TITLE I—AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST ENTRY

SEC. 101. PREVENTING TERRORISTS FROM OBTAINING RELIEF FROM REMOVAL.

(a) CONDITIONS FOR GRANTING ASYLUM.—Section 208(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(1)) is amended—

(1) by striking "The Attorney General" the first place such term appears and inserting the following:

"(A) ELIGIBILITY.—The Secretary of Homeland Security or the Attorney General";

H. R. 1268—73

(2) by striking "the Attorney General" the second and third places such term appears and inserting "the Secretary of Homeland Security or the Attorney General"; and

(3) by adding at the end the following:

"(B) BURDEN OF PROOF.—

"(i) IN GENERAL.—The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 101(a)(42)(A). To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.

"(ii) SUSTAINING BURDEN.—The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(iii) CREDIBILITY DETERMINATION.—Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

(b) EXCEPTIONS TO ELIGIBILITY FOR ASYLUM.—Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended—

(1) by striking "inadmissible under" each place such term appears and inserting "described in"; and

(2) by striking "removable under".

(c) WITHHOLDING OF REMOVAL.—Section 241(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)) is amended by adding at the end the following:

H. R. 1268—74

"(C) SUSTAINING BURDEN OF PROOF; CREDIBILITY DETER-
MINATIONS.—In determining whether an alien has dem-
onstrated that the alien's life or freedom would be threat-
ened for a reason described in subparagraph (A), the trier
of fact shall determine whether the alien has sustained
the alien's burden of proof, and shall make credibility deter-
minations, in the manner described in clauses (ii) and
(iii) of section 208(b)(1)(B).".

(d) OTHER REQUESTS FOR RELIEF FROM REMOVAL.—Section
240(c) of the Immigration and Nationality Act (8 U.S.C. 1230(c))
is amended—
(1) by redesignating paragraphs (4), (5), and (6) as para-
graphs (5), (6), and (7), respectively; and
(2) by inserting after paragraph (3) the following:
"(4) APPLICATIONS FOR RELIEF FROM REMOVAL.—
"(A) IN GENERAL.—An alien applying for relief or
protection from removal has the burden of proof to establish
that the alien—
"(i) satisfies the applicable eligibility requirements;
and
"(ii) with respect to any form of relief that is
granted in the exercise of discretion, that the alien
merits a favorable exercise of discretion.
"(B) SUSTAINING BURDEN.—The applicant must comply
with the applicable requirements to submit information
or documentation in support of the applicant's application
for relief or protection as provided by law or by regulation
or in the instructions for the application form. In evaluating
the testimony of the applicant or other witness in support
of the application, the immigration judge will determine
whether or not the testimony is credible, is persuasive,
and refers to specific facts sufficient to demonstrate that
the applicant has satisfied the applicant's burden of proof.
In determining whether the applicant has met such burden,
the immigration judge shall weigh the credible testimony
along with other evidence of record. Where the immigration
judge determines that the applicant should provide evi-
dence which corroborates otherwise credible testimony,
such evidence must be provided unless the applicant dem-
onstrates that the applicant does not have the evidence
and cannot reasonably obtain the evidence.
"(C) CREDIBILITY DETERMINATION.—Considering the
totality of the circumstances, and all relevant factors, the
immigration judge may base a credibility determination
on the demeanor, candor, or responsiveness of the applicant
or witness, the inherent plausibility of the applicant's or
witness's account, the consistency between the applicant's
or witness's written and oral statements (whenever made
and whether or not under oath, and considering the cir-
cumstances under which the statements were made), the
internal consistency of each such statement, the consistency
of such statements with other evidence of record (including
the reports of the Department of State on country condi-
tions), and any inaccuracies or falsehoods in such state-
ments, without regard to whether an inconsistency, inaccu-
racy, or falsehood goes to the heart of the applicant's claim,
or any other relevant factor. There is no presumption of

H. R. 1268—75

credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

(e) STANDARD OF REVIEW FOR ORDERS OF REMOVAL.—Section 242(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1252(b)(4)) is amended by adding at the end, after subparagraph (D), the following: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 208(b)(1)(B), 240(c)(4)(B), or 241(b)(3)(C), unless the court finds, pursuant to section 242(b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.".

(f) CLARIFICATION OF DISCRETION.—Section 242(a)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(2)(B)) is amended—

(1) by inserting "or the Secretary of Homeland Security" after "Attorney General" each place such term appears; and

(2) in the matter preceding clause (i), by inserting "and regardless of whether the judgment, decision, or action is made in removal proceedings," after "other provision of law,".

(g) REMOVAL OF CAPS.—

(1) ASYLEES.—Section 209 of the Immigration and Nationality Act (8 U.S.C. 1159) is amended—

(A) in subsection (a)(1)—

(i) by striking "Service" and inserting "Department of Homeland Security"; and

(ii) by striking "Attorney General" each place such term appears and inserting "Secretary of Homeland Security or the Attorney General";

(B) in subsection (b)—

(i) by striking "Not more" and all that follows through "asylum who—" and inserting "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of ,an alien lawfully admitted for permanent residence the status of any alien granted asylum who—"; and

(ii) in the matter following paragraph (5), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General"; and

(C) in subsection (c), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General".

(2) PERSONS RESISTING COERCIVE POPULATION CONTROL METHODS.—Section 207(a) of the Immigration and Nationality Act (8 U.S.C. 1157(a)) is amended by striking paragraph (5).

(h) EFFECTIVE DATES.—

(1) The amendments made by paragraphs (1) and (2) of subsection (a) shall take effect as if enacted on March 1, 2003.

(2) The amendments made by subsections (a)(3), (b), (c), and (d) shall take effect on the date of the enactment of this division and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date.

(3) The amendment made by subsection (e) shall take effect on the date of the enactment of this division and shall apply

to all cases in which the final administrative removal order is or was issued before, on, or after such date.

(4) The amendments made by subsection (f) shall take effect on the date of the enactment of this division and shall apply to all cases pending before any court on or after such date.

(5) The amendments made by subsection (g) shall take effect on the date of the enactment of this division.

(i) REPEAL.—Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458) is repealed.

## SEC. 102. WAIVER OF LEGAL REQUIREMENTS NECESSARY FOR IMPROVEMENT OF BARRIERS AT BORDERS; FEDERAL COURT REVIEW.

Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:

"(c) WAIVER.—

"(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

"(2) FEDERAL COURT REVIEW.—

"(A) IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"(B) TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"(C) ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

## SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TERRORIST-RELATED ACTIVITIES.

(a) IN GENERAL.—So much of section 212(a)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)) as precedes the final sentence is amended to read as follows:

"(i) IN GENERAL.—Any alien who—

"(I) has engaged in a terrorist activity;

"(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

H. R. 1268—77

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

"(IV) is a representative (as defined in clause (v)) of—

"(aa) a terrorist organization (as defined in clause (vi)); or

"(bb) a political, social, or other group that endorses or espouses terrorist activity;

"(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

"(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

"(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18, United States Code) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

"(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.".

(b) ENGAGE IN TERRORIST ACTIVITY DEFINED.—Section 212(a)(3)(B)(iv) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iv)) is amended to read as follows:

"(iv) ENGAGE IN TERRORIST ACTIVITY DEFINED.—As used in this Act, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization—

"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

"(II) to prepare or plan a terrorist activity;

"(III) to gather information on potential targets for terrorist activity;

"(IV) to solicit funds or other things of value for—

"(aa) a terrorist activity;

"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(V) to solicit any individual—

"(aa) to engage in conduct otherwise described in this subsection;

H. R. 1268—78

"(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

"(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.".

(c) TERRORIST ORGANIZATION DEFINED.—Section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)) is amended to read as follows:

"(vi) TERRORIST ORGANIZATION DEFINED.—As used in this section, the term 'terrorist organization' means an organization—

"(I) designated under section 219;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

"(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).".

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this division, and these amendments, and section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)), as amended by this section, shall apply to—

H. R. 1268—79

(1) removal proceedings instituted before, on, or after the date of the enactment of this division; and

(2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

## SEC. 104. WAIVER FOR CERTAIN GROUNDS OF INADMISSIBILITY.

Section 212(d)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(3)) is amended—

(1) by striking "(3)" and inserting "(3)(A)";

(2) by striking "alien (A)" and inserting "alien (i)";

(3) by striking "or (B)" and inserting "or (ii)"; and

(4) by adding at the end the following:

"(B)(i) The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may conclude in such Secretary's sole unreviewable discretion that subsection (a)(3)(B)(i)(IV)(bb) or (a)(3)(B)(i)(VII) shall not apply to an alien, that subsection (a)(3)(B)(iv)(VI) shall not apply with respect to any material support an alien afforded to an organization or individual that has engaged in a terrorist activity, or that subsection (a)(3)(B)(vi)(III) shall not apply to a group solely by virtue of having a subgroup within the scope of that subsection. The Secretary of State may not, however, exercise discretion under this clause with respect to an alien once removal proceedings against the alien are instituted under section 240.

"(ii) Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.".

## SEC. 105. REMOVAL OF TERRORISTS.

(a) IN GENERAL.—

(1) IN GENERAL.—Section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)) is amended to read as follows:

"(B) TERRORIST ACTIVITIES.—Any alien who is described in subparagraph (B) or (F) of section 212(a)(3) is deportable.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall take effect on the date of the enactment of this division, and the amendment, and section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)), as amended by such paragraph, shall apply to—

(A) removal proceedings instituted before, on, or after the date of the enactment of this division; and

(B) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

H. R. 1268—80

(b) REPEAL.—Effective as of the date of the enactment of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458), section 5402 of such Act is repealed, and the Immigration and Nationality Act shall be applied as if such section had not been enacted.

## SEC. 106. JUDICIAL REVIEW OF ORDERS OF REMOVAL.

(a) IN GENERAL.—Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended—

(1) in subsection (a)—

(A) in paragraph (2)—

(i) in subparagraph (A), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "Notwithstanding any other provision of law";

(ii) in each of subparagraphs (B) and (C), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D)" after "Notwithstanding any other provision of law"; and

(iii) by adding at the end the following:

"(D) JUDICIAL REVIEW OF CERTAIN LEGAL CLAIMS.— Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."; and

(B) by adding at the end the following:

"(4) CLAIMS UNDER THE UNITED NATIONS CONVENTION.— Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

"(5) EXCLUSIVE MEANS OF REVIEW.—Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act, except as provided in subsection (e). For purposes of this Act, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms 'judicial review' and 'jurisdiction to review' include habeas corpus review pursuant to section 2241 of title 28, United States Code, or any other habeas corpus provision,

H. R. 1268—81

sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).";

(2) in subsection (b)(9), by adding at the end the following: "Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact."; and

(3) in subsection (g), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division.

(c) TRANSFER OF CASES.—If an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment of this division, then the district court shall transfer the case (or the part of the case that challenges the order of removal, deportation, or exclusion) to the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section, or under section 309(c)(4)(D) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note). The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section shall not apply.

(d) TRANSITIONAL RULE CASES.—A petition for review filed under former section 106(a) of the Immigration and Nationality Act (as in effect before its repeal by section 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1252 note)) shall be treated as if it had been filed as a petition for review under section 242 of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, such petition for review shall be the sole and exclusive means for judicial review of an order of deportation or exclusion.

# TITLE II—IMPROVED SECURITY FOR DRIVERS' LICENSES AND PERSONAL IDENTIFICATION CARDS

**SEC. 201. DEFINITIONS.**

In this title, the following definitions apply:

H. R. 1268—82

(1) DRIVER'S LICENSE.—The term "driver's license" means a motor vehicle operator's license, as defined in section 30301 of title 49, United States Code.

(2) IDENTIFICATION CARD.—The term "identification card" means a personal identification card, as defined in section 1028(d) of title 18, United States Code, issued by a State.

(3) OFFICIAL PURPOSE.—The term "official purpose" includes but is not limited to accessing Federal facilities, boarding federally regulated commercial aircraft, entering nuclear power plants, and any other purposes that the Secretary shall determine.

(4) SECRETARY.—The term "Secretary" means the Secretary of Homeland Security.

(5) STATE.—The term "State" means a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and any other territory or possession of the United States.

## SEC. 202. MINIMUM DOCUMENT REQUIREMENTS AND ISSUANCE STANDARDS FOR FEDERAL RECOGNITION.

(a) MINIMUM STANDARDS FOR FEDERAL USE.—

(1) IN GENERAL.—Beginning 3 years after the date of the enactment of this division, a Federal agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section.

(2) STATE CERTIFICATIONS.—The Secretary shall determine whether a State is meeting the requirements of this section based on certifications made by the State to the Secretary. Such certifications shall be made at such times and in such manner as the Secretary, in consultation with the Secretary of Transportation, may prescribe by regulation.

(b) MINIMUM DOCUMENT REQUIREMENTS.—To meet the requirements of this section, a State shall include, at a minimum, the following information and features on each driver's license and identification card issued to a person by the State:

(1) The person's full legal name.

(2) The person's date of birth.

(3) The person's gender.

(4) The person's driver's license or identification card number.

(5) A digital photograph of the person.

(6) The person's address of principle residence.

(7) The person's signature.

(8) Physical security features designed to prevent tampering, counterfeiting, or duplication of the document for fraudulent purposes.

(9) A common machine-readable technology, with defined minimum data elements.

(c) MINIMUM ISSUANCE STANDARDS.—

(1) IN GENERAL.—To meet the requirements of this section, a State shall require, at a minimum, presentation and verification of the following information before issuing a driver's license or identification card to a person:

H. R. 1268—83

(A) A photo identity document, except that a non-photo identity document is acceptable if it includes both the person's full legal name and date of birth.

(B) Documentation showing the person's date of birth.

(C) Proof of the person's social security account number or verification that the person is not eligible for a social security account number.

(D) Documentation showing the person's name and address of principal residence.

(2) SPECIAL REQUIREMENTS.—

(A) IN GENERAL.—To meet the requirements of this section, a State shall comply with the minimum standards of this paragraph.

(B) EVIDENCE OF LAWFUL STATUS.—A State shall require, before issuing a driver's license or identification card to a person, valid documentary evidence that the person—

(i) is a citizen or national of the United States;

(ii) is an alien lawfully admitted for permanent or temporary residence in the United States;

(iii) has conditional permanent resident status in the United States;

(iv) has an approved application for asylum in the United States or has entered into the United States in refugee status;

(v) has a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States;

(vi) has a pending application for asylum in the United States;

(vii) has a pending or approved application for temporary protected status in the United States;

(viii) has approved deferred action status; or

(ix) has a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.

(C) TEMPORARY DRIVERS' LICENSES AND IDENTIFICATION CARDS.—

(i) IN GENERAL.—If a person presents evidence under any of clauses (v) through (ix) of subparagraph (B), the State may only issue a temporary driver's license or temporary identification card to the person.

(ii) EXPIRATION DATE.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph shall be valid only during the period of time of the applicant's authorized stay in the United States or, if there is no definite end to the period of authorized stay, a period of one year.

(iii) DISPLAY OF EXPIRATION DATE.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph shall clearly indicate that it is temporary and shall state the date on which it expires.

(iv) RENEWAL.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph may be renewed only upon presentation

H. R. 1268—84

of valid documentary evidence that the status by which the applicant qualified for the temporary driver's license or temporary identification card has been extended by the Secretary of Homeland Security.

(3) VERIFICATION OF DOCUMENTS.—To meet the requirements of this section, a State shall implement the following procedures:

(A) Before issuing a driver's license or identification card to a person, the State shall verify, with the issuing agency, the issuance, validity, and completeness of each document required to be presented by the person under paragraph (1) or (2).

(B) The State shall not accept any foreign document, other than an official passport, to satisfy a requirement of paragraph (1) or (2).

(C) Not later than September 11, 2005, the State shall enter into a memorandum of understanding with the Secretary of Homeland Security to routinely utilize the automated system known as Systematic Alien Verification for Entitlements, as provided for by section 404 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (110 Stat. 3009–664), to verify the legal presence status of a person, other than a United States citizen, applying for a driver's license or identification card.

(d) OTHER REQUIREMENTS.—To meet the requirements of this section, a State shall adopt the following practices in the issuance of drivers' licenses and identification cards:

(1) Employ technology to capture digital images of identity source documents so that the images can be retained in electronic storage in a transferable format.

(2) Retain paper copies of source documents for a minimum of 7 years or images of source documents presented for a minimum of 10 years.

(3) Subject each person applying for a driver's license or identification card to mandatory facial image capture.

(4) Establish an effective procedure to confirm or verify a renewing applicant's information.

(5) Confirm with the Social Security Administration a social security account number presented by a person using the full social security account number. In the event that a social security account number is already registered to or associated with another person to which any State has issued a driver's license or identification card, the State shall resolve the discrepancy and take appropriate action.

(6) Refuse to issue a driver's license or identification card to a person holding a driver's license issued by another State without confirmation that the person is terminating or has terminated the driver's license.

(7) Ensure the physical security of locations where drivers' licenses and identification cards are produced and the security of document materials and papers from which drivers' licenses and identification cards are produced.

(8) Subject all persons authorized to manufacture or produce drivers' licenses and identification cards to appropriate security clearance requirements.

H. R. 1268—85

(9) Establish fraudulent document recognition training programs for appropriate employees engaged in the issuance of drivers' licenses and identification cards.

(10) Limit the period of validity of all driver's licenses and identification cards that are not temporary to a period that does not exceed 8 years.

(11) In any case in which the State issues a driver's license or identification card that does not satisfy the requirements of this section, ensure that such license or identification card—

(A) clearly states on its face that it may not be accepted by any Federal agency for federal identification or any other official purpose; and

(B) uses a unique design or color indicator to alert Federal agency and other law enforcement personnel that it may not be accepted for any such purpose.

(12) Provide electronic access to all other States to information contained in the motor vehicle database of the State.

(13) Maintain a State motor vehicle database that contains, at a minimum—

(A) all data fields printed on drivers' licenses and identification cards issued by the State; and

(B) motor vehicle drivers' histories, including motor vehicle violations, suspensions, and points on licenses.

## SEC. 203. TRAFFICKING IN AUTHENTICATION FEATURES FOR USE IN FALSE IDENTIFICATION DOCUMENTS.

(a) CRIMINAL PENALTY.—Section 1028(a)(8) of title 18, United States Code, is amended by striking "false authentication features" and inserting "false or actual authentication features".

(b) USE OF FALSE DRIVER'S LICENSE AT AIRPORTS.—

(1) IN GENERAL.—The Secretary shall enter, into the appropriate aviation security screening database, appropriate information regarding any person convicted of using a false driver's license at an airport (as such term is defined in section 40102 of title 49, United States Code).

(2) FALSE DEFINED.—In this subsection, the term "false" has the same meaning such term has under section 1028(d) of title 18, United States Code.

## SEC. 204. GRANTS TO STATES.

(a) IN GENERAL.—The Secretary may make grants to a State to assist the State in conforming to the minimum standards set forth in this title.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Secretary for each of the fiscal years 2005 through 2009 such sums as may be necessary to carry out this title.

## SEC. 205. AUTHORITY.

(a) PARTICIPATION OF SECRETARY OF TRANSPORTATION AND STATES.—All authority to issue regulations, set standards, and issue grants under this title shall be carried out by the Secretary, in consultation with the Secretary of Transportation and the States.

(b) EXTENSIONS OF DEADLINES.—The Secretary may grant to a State an extension of time to meet the requirements of section 202(a)(1) if the State provides adequate justification for noncompliance.

**SEC. 206. REPEAL.**

Section 7212 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458) is repealed.

**SEC. 207. LIMITATION ON STATUTORY CONSTRUCTION.**

Nothing in this title shall be construed to affect the authorities or responsibilities of the Secretary of Transportation or the States under chapter 303 of title 49, United States Code.

# TITLE III—BORDER INFRASTRUCTURE AND TECHNOLOGY INTEGRATION

**SEC. 301. VULNERABILITY AND THREAT ASSESSMENT.**

(a) STUDY.—The Under Secretary of Homeland Security for Border and Transportation Security, in consultation with the Under Secretary of Homeland Security for Science and Technology and the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, shall study the technology, equipment, and personnel needed to address security vulnerabilities within the United States for each field office of the Bureau of Customs and Border Protection that has responsibility for any portion of the United States borders with Canada and Mexico. The Under Secretary shall conduct follow-up studies at least once every 5 years.

(b) REPORT TO CONGRESS.—The Under Secretary shall submit a report to Congress on the Under Secretary's findings and conclusions from each study conducted under subsection (a) together with legislative recommendations, as appropriate, for addressing any security vulnerabilities found by the study.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Department of Homeland Security Directorate of Border and Transportation Security such sums as may be necessary for fiscal years 2006 through 2011 to carry out any such recommendations from the first study conducted under subsection (a).

**SEC. 302. USE OF GROUND SURVEILLANCE TECHNOLOGIES FOR BORDER SECURITY.**

(a) PILOT PROGRAM.—Not later than 180 days after the date of the enactment of this division, the Under Secretary of Homeland Security for Science and Technology, in consultation with the Under Secretary of Homeland Security for Border and Transportation Security, the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, and the Secretary of Defense, shall develop a pilot program to utilize, or increase the utilization of, ground surveillance technologies to enhance the border security of the United States. In developing the program, the Under Secretary shall—

(1) consider various current and proposed ground surveillance technologies that could be utilized to enhance the border security of the United States;

(2) assess the threats to the border security of the United States that could be addressed by the utilization of such technologies; and

(3) assess the feasibility and advisability of utilizing such technologies to address such threats, including an assessment

H. R. 1268—87

of the technologies considered best suited to address such threats.

(b) ADDITIONAL REQUIREMENTS.—

(1) IN GENERAL.—The pilot program shall include the utilization of a variety of ground surveillance technologies in a variety of topographies and areas (including both populated and unpopulated areas) on both the northern and southern borders of the United States in order to evaluate, for a range of circumstances—

(A) the significance of previous experiences with such technologies in homeland security or critical infrastructure protection for the utilization of such technologies for border security;

(B) the cost, utility, and effectiveness of such technologies for border security; and

(C) liability, safety, and privacy concerns relating to the utilization of such technologies for border security.

(2) TECHNOLOGIES.—The ground surveillance technologies utilized in the pilot program shall include the following:

(A) Video camera technology.

(B) Sensor technology.

(C) Motion detection technology.

(c) IMPLEMENTATION.—The Under Secretary of Homeland Security for Border and Transportation Security shall implement the pilot program developed under this section.

(d) REPORT.—Not later than 1 year after implementing the pilot program under subsection (a), the Under Secretary shall submit a report on the program to the Senate Committee on Commerce, Science, and Transportation, the House of Representatives Committee on Science, the House of Representatives Committee on Homeland Security, and the House of Representatives Committee on the Judiciary. The Under Secretary shall include in the report a description of the program together with such recommendations as the Under Secretary finds appropriate, including recommendations for terminating the program, making the program permanent, or enhancing the program.

## SEC. 303. ENHANCEMENT OF COMMUNICATIONS INTEGRATION AND INFORMATION SHARING ON BORDER SECURITY.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary of Homeland Security, acting through the Under Secretary of Homeland Security for Border and Transportation Security, in consultation with the Under Secretary of Homeland Security for Science and Technology, the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, the Assistant Secretary of Commerce for Communications and Information, and other appropriate Federal, State, local, and tribal agencies, shall develop and implement a plan—

(1) to improve the communications systems of the departments and agencies of the Federal Government in order to facilitate the integration of communications among the departments and agencies of the Federal Government and State, local government agencies, and Indian tribal agencies on matters relating to border security; and

(2) to enhance information sharing among the departments and agencies of the Federal Government, State and local

H. R. 1268—88

government agencies, and Indian tribal agencies on such mat-
ters.

(b) REPORT.—Not later than 1 year after implementing the
plan under subsection (a), the Secretary shall submit a copy of
the plan and a report on the plan, including any recommendations
the Secretary finds appropriate, to the Senate Committee on Com-
merce, Science, and Transportation, the House of Representatives
Committee on Science, the House of Representatives Committee
on Homeland Security, and the House of Representatives Committee
on the Judiciary.

# TITLE IV—TEMPORARY WORKERS

### SEC. 401. SHORT TITLE.

This title may be cited as the "Save Our Small and Seasonal
Businesses Act of 2005".

### SEC. 402. NUMERICAL LIMITATIONS ON H-2B WORKERS.

(a) IN GENERAL.—Section 214(g) of the Immigration and Nation-
ality Act (8 U.S.C. 1184(g)) is amended by adding at the end
the following:

"(9)(A) Subject to subparagraphs (B) and (C), an alien who
has already been counted toward the numerical limitations of para-
graph (1)(B) during any 1 of the 3 fiscal years prior to the fiscal
year of the approved start date of a petition for a nonimmigrant
worker described in section 101(a)(15)(H)(ii)(b) shall not be counted
toward such limitation for the fiscal year in which the petition
is approved. Such an alien shall be considered a returning worker.

"(B) A petition referred to in subparagraph (A) shall include,
with respect to a returning worker—

"(i) all information and evidence that the Secretary of
Homeland Security determines is required to support a petition
for status under section 101(a)(15)(H)(ii)(b);

"(ii) the full name of the alien; and

"(iii) a certification to the Department of Homeland Secu-
rity that the alien is a returning worker.

"(C) An H-2B visa or grant of nonimmigrant status for a
returning worker shall be approved only if the alien is confirmed
to be a returning worker by—

"(i) the Department of State; or

"(ii) if the alien is visa exempt or seeking to change to
status under section 101 (a)(15)(H)(ii)(b), the Department of
Homeland Security.".

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment in subsection (a) shall
take effect as if enacted on October 1, 2004, and shall expire
on October 1, 2006.

(2) IMPLEMENTATION.—Not later than 14 days after the
date of the enactment of this Act, the Secretary of Homeland
Security shall begin accepting and processing petitions filed
on behalf of aliens described in section 101(a)(15)(H)(ii)(b) of
the Immigration and Nationality Act, in a manner consistent
with this section and the amendments made by this section.
Notwithstanding section 214(g)(9)(B) of such Act, as added by
subsection (a), the Secretary of Homeland Security shall allo-
cate additional numbers for fiscal year 2005 based on statistical

H. R. 1268—89

estimates and projections derived from Department of State data.

## SEC. 403. FRAUD PREVENTION AND DETECTION FEE.

(a) IMPOSITION OF FEE.—Section 214(c) of the Immigration and Nationality Act (8 U.S.C. 1184(c)), as amended by section 426(a) of division J of the Consolidated Appropriations Act, 2005 (Public Law 108–447), is amended by adding at the end the following:

"(13)(A) In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) for nonimmigrant workers described in section 101(a)(15)(H)(ii)(b).

"(B) The amount of the fee imposed under subparagraph (A) shall be $150.".

(b) USE OF FEES.—

(1) FRAUD PREVENTION AND DETECTION ACCOUNT.—Subsection (v) of section 286 of the Immigration and Nationality Act (8 U.S.C. 1356), as added by section 426(b) of division J of the Consolidated Appropriations Act, 2005 (Public Law 108–447), is amended—

(A) in paragraphs (1), (2)(A), (2)(B), (2)(C), and (2)(D) by striking "H1–B and L" each place it appears;

(B) in paragraph (1), as amended by subparagraph (A), by striking "section 214(c)(12)" and inserting "paragraph (12) or (13) of section 214(c)";

(C) in paragraphs (2)(A)(i) and (2)(B), as amended by subparagraph (A), by striking "(H)(i)" each place it appears and inserting "(H)(i), (H)(ii),"; and

(D) in paragraph (2)(D), as amended by subparagraph (A), by inserting before the period at the end "or for programs and activities to prevent and detect fraud with respect to petitions under paragraph (1) or (2)(A) of section 214(c) to grant an alien nonimmigrant status described in section 101(a)(15)(H)(ii)".

(2) CONFORMING AMENDMENT.—The heading of such subsection (v) of section 286 is amended by striking "H1–B and L".

(o) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall take effect 14 days after the date of the enactment of this Act and shall apply to filings for a fiscal year after fiscal year 2005.

## SEC. 404. SANCTIONS.

(a) IN GENERAL.—Section 214(c) of the Immigration and Nationality Act (8 U.S.C. 1184(c)), as amended by section 403, is further amended by adding at the end the following:

"(14)(A) If the Secretary of Homeland Security finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under section 101(a)(15)(H)(ii)(b) or a willful misrepresentation of a material fact in such petition—

"(i) the Secretary of Homeland Security may, in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the Secretary of Homeland Security determines to be appropriate; and

H. R. 1268—90

"(ii) the Secretary of Homeland Security may deny petitions filed with respect to that employer under section 204 or paragraph (1) of this subsection during a period of at least 1 year but not more than 5 years for aliens to be employed by the employer.

"(B) The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i).

"(C) In determining the level of penalties to be assessed under subparagraph (A), the highest penalties shall be reserved for willful failures to meet any of the conditions of the petition that involve harm to United States workers.

"(D) In this paragraph, the term 'substantial failure' means the willful failure to comply with the requirements of this section that constitutes a significant deviation from the terms and conditions of a petition.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 2005.

## SEC. 405. ALLOCATION OF H–2B VISAS OR H–2B NONIMMIGRANT STATUS DURING A FISCAL YEAR.

Section 214(g) of the Immigration and Nationality Act (8 U.S.C. 1184(g)), as amended by section 402, is further amended by adding at the end the following new paragraph:

"(10) The numerical limitations of paragraph (1)(B) shall be allocated for a fiscal year so that the total number of aliens subject to such numerical limits who enter the United States pursuant to a visa or are accorded nonimmigrant status under section 101(a)(15)(H)(ii)(b) during the first 6 months of such fiscal year is not more than 33,000.".

## SEC. 406. SUBMISSION TO CONGRESS OF INFORMATION REGARDING H–2B NONIMMIGRANTS.

Section 416 of the American Competitiveness and Workforce Improvement Act of 1998 (title IV of division C of Public Law 105–277; 8 U.S.C. 1184 note) is amended—

(1) by striking "Attorney General" each place that term appears and inserting "Secretary of Homeland Security"; and

(2) by adding at the end the following new subsection:

"(d) PROVISION OF INFORMATION.—

"(1) SEMIANNUAL NOTIFICATION.—Beginning not later than March 1, 2006, the Secretary of Homeland Security and the Secretary of State shall notify, on a semiannual basis, the Committees on the Judiciary of the House of Representatives and the Senate of the number of aliens who during the preceding 1-year period—

"(A) were issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(ii)(b)); or

"(B) had such a visa or such status be revoked or otherwise terminated.

"(2) ANNUAL SUBMISSION.—Beginning in fiscal year 2007, the Secretary of Homeland Security and the Secretary of State shall submit, on an annual basis, to the Committees on the Judiciary of the House of Representatives and the Senate—

H. R. 1268—91

"(A) information on the countries of origin of, occupations of, and compensation paid to aliens who were issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(ii)(b)) during the previous fiscal year;

"(B) the number of aliens who had such a visa or such status expire or be revoked or otherwise terminated during each month of such fiscal year; and

"(C) the number of aliens who were provided nonimmigrant status under such section during both such fiscal year and the preceding fiscal year.

"(3) INFORMATION MAINTAINED BY STATE.—If the Secretary of Homeland Security determines that information maintained by the Secretary of State is required to make a submission described in paragraph (1) or (2), the Secretary of State shall provide such information to the Secretary of Homeland Security upon request.".

## SEC. 407. EXEMPTION FROM ADMINISTRATIVE PROCEDURE ACT.

The requirements of chapter 5 of title 5, United States Code (commonly referred to as the "Administrative Procedure Act") or any other law relating to rulemaking, information collection or publication in the Federal Register, shall not apply to any action to implement sections 402, 403, and 405 or the amendments made by such sections to the extent the Secretary Homeland of Security, the Secretary of Labor, or the Secretary of State determine that compliance with any such requirement would impede the expeditious implementation of such sections or the amendments made by such sections.

# TITLE V—OTHER CHANGES TO PROVISIONS GOVERNING NONIMMIGRANT AND IMMIGRANT VISAS

## SEC. 501. RECIPROCAL VISAS FOR NATIONALS OF AUSTRALIA.

(a) IN GENERAL.—Section 101(a)(15)(E) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(E)) is amended—

(1) by adding at the end "or (iii) solely to perform services in a specialty occupation in the United States if the alien is a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 212(t)(1);"; and

(2) in clause (i), by striking "or" after "national;".

(b) NUMERICAL LIMITATION TO ANY SINGLE FOREIGN STATE.—Section 214(g) of such Act (8 U.S.C. 1184(g)), as amended by section 405, is further amended by adding at the end the following new paragraph:

"(11)(A) The Secretary of State may not approve a number of initial applications submitted for aliens described in section 101(a)(15)(E)(iii) that is more than the applicable numerical limitation set out in this paragraph.

H. R. 1268—92

"(B) The applicable numerical limitation referred to in subparagraph (A) is 10,500 for each fiscal year.

"(C) The applicable numerical limitation referred to in subparagraph (A) shall only apply to principal aliens and not to the spouses or children of such aliens.".

(c) SPECIALTY OCCUPATION DEFINED.—Section 214(i)(1) of such Act (8 U.S.C. 1184(i)(1)) is amended by inserting ", section 101(a)(15)(E)(iii)," after "section 101(a)(15)(H)(i)(b)".

(d) ATTESTATION.—Section 212(t) of such Act (8 U.S.C. 1182(t)), as added by section 402(b)(2) of the United States-Chile Free Trade Agreement Implementation Act (Public Law 108–77; 117 Stat. 941), is amended—

(1) by inserting "or section 101(a)(15)(E)(iii)" after "section 101(a)(15)(H)(i)(b1)" each place it appears; and

(2) in paragraphs (3)(C)(i)(II), (3)(C)(ii)(II), and (3)(C)(iii)(II) by striking "or 101(a)(15)(H)(i)(b1)" each place it appears and inserting "101(a)(15)(H)(i)(b1), or 101(a)(15)(E)(iii)".

### SEC. 502. VISAS FOR NURSES.

Section 106(d) of the American Competitiveness in the Twenty-first Century Act of 2000 (Public Law 106–313; 8 U.S.C. 1153 note) is amended—

(1) in paragraph (1), by inserting before the period at the end of the second sentence "and any such visa that is made available due to the difference between the number of employment-based visas that were made available in fiscal year 2001, 2002, 2003, or 2004 and the number of such visas that were actually used in such fiscal year shall be available only to employment-based immigrants (and their family members accompanying or following to join under section 203(d) of such Act (8 U.S.C. 1153(d))) whose immigrant worker petitions were approved based on schedule A, as defined in section 656.5 of title 20, Code of Federal Regulations, as promulgated by the Secretary of Labor";

(2) in paragraph (2)(A), by striking "and 2000" and inserting "through 2004"; and

(3) in paragraph (2), by amending subparagraph (B) to read as follows:

"(B)(i) REDUCTION.—The number described in subparagraph (A) shall be reduced, for each fiscal year after fiscal year 2001, by the cumulative number of immigrant visas actually used under paragraph (1) for previous fiscal years.

H. R. 1268—93

"(ii) MAXIMUM.—The total number of visas made available under paragraph (1) from unused visas from the fiscal years 2001 through 2004 may not exceed 50,000.".

*Speaker of the House of Representatives.*

*Vice President of the United States and President of the Senate.*

| 109TH CONGRESS<br>*1st Session* } | HOUSE OF REPRESENTATIVES | { REPORT<br>109–72 |
|---|---|---|

## MAKING EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2005, AND FOR OTHER PURPOSES

―――――――

MAY 3, 2005.—Ordered to be printed

―――――――

Mr. LEWIS of California, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany H.R. 1268]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1268), "making emergency supplemental appropriations for the fiscal year ending September 30, 2005, to establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, to ensure expeditious construction of the San Diego border fence, and for other purposes", having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

*SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief Act, 2005".*

*SEC. 2. TABLE OF CONTENTS.*

*The table of contents for this Act is as follows:*

*Sec. 1. Short title.*
*Sec. 2. Table of contents.*
*Sec. 3. References.*

20–930

160

Conference agreement compared with:

| | |
|---|---:|
| Budget estimates of new (obligational) authority, fiscal year 2005 ................................................................................ | −1,150 |
| House bill, fiscal year 2005 ............................................................ | +674,600 |
| Senate bill, fiscal year 2005 .......................................................... | +821,533 |

## DIVISION B—REAL ID ACT OF 2005

### TITLE I—AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST ENTRY

Section 101 of the conference agreement includes language modified from language proposed in section 101 of division B of the House bill. The Senate did not include similar language.

Asylum Reform: As the staff of the 9/11 Commission determined, terrorist aliens have exploited our asylum laws to enter and remain in the United States.

Aliens who pose a danger to the national security of the United States have been barred from receiving asylum and withholding of removal by regulation since 1990. In 1996, Congress amended the Immigration and Nationality Act (INA) to explicitly bar aliens who are inadmissible or deportable under terrorism provisions from receiving asylum and withholding. Despite these bars to dangerous aliens receiving asylum, however, the 9/11 Terrorist Travel monograph notes that "[a] number of terrorists [have] . . . abused the asylum system." Mono. at 106.

For example, Ramzi Yousef and Ahmad Ajaj, plotters of the first World Trade Center bombing, "concocted bogus political asylum stories when they arrived" to remain in the United States in 1992. Id. at 50. Similarly, the Blind Sheikh, Sheikh Abdul Rahman, "avoided being removed from the United States by filing an application for asylum and withholding of deportation to Egypt in . . . 1992." Id. at 55.

In addition to these aliens whose asylum abuse was specifically described in the Terrorist Travel Monograph, other alien terrorists have abused our generous asylum laws. In January 1993, 11 months after he applied for asylum, Mir Aimal Kansi, also known as Mir Aimal Kasi, killed two CIA employees in front of CIA headquarters in Langley, Virginia. Camarota, Steven, "The Open Door: How Militant Islamic Terrorists Entered and Remained in the United States, 1993–2001," Center for Immigration Studies, May 2002, at 7, www.cis.org/articles/2002/Paper21/terrorism2.html>; see also Border Security and Enforcement: The 9/11 Commission Staff Report on Training for Border Inspectors, Document Integrity, and Defects in the U.S. Visa Program Before the Subcommittee on Immigration, Border Security and Citizenship and the Subcommittee on Terrorism, Technology, and Homeland Security of the Senate Judiciary Committee, 108th Cong., 1st Sess. (2005) (statement of Janice Kephart). Kansi had been a visa overstay for almost a year before filing that application. "The Open Door", at 7. Hesham Hedayet killed two in a shooting spree at LAX on July 4, 2002. Immigration and Naturalization Service's (INS's) Interactions with Hesham Mohamed Ali Hedayet Before the Subcommittee on Immigration, Border Security and Claims of the House Judiciary Committee, 107th Cong., 2d Sess. at 7 (statement of William Yates, Deputy Executive Associate Commissioner, INS) (2002). He entered

161

the United States in 1992, and extended his stay by filing an asylum application one month before his stay ended. Id. His application was administratively denied, but he adjusted his status 17 months later after his wife won the visa lottery. Id. at 7–8.

Nor did the reforms in the mid–1990s end such abuse. In February 1997, for example, Gazi Ibrahim Abu Mezer was released after entering the United States illegally and after stating that he would be applying for asylum. Special Report of the United States Department of Justice, Office of the Inspector General, "Bombs in Brooklyn: How the Two Illegal Aliens Arrested for Plotting to Bomb the New York Subway Entered and Remained in the United States" (March 1998). In April 1997, he filed an asylum application in which he claimed that "the Israeli government continuously persecuted him." Id. On July 31, 1997, Mezer was arrested in a Brooklyn apartment for allegedly planning to bomb the New York City subway system. Id.

In January 1999, Somali national Nuradin Abdi was granted asylum. Government's Motion to Detain Defendant and Memorandum in Support at 4, United States v. Nuradin M. Abdi (S.D. Ohio 2004) (No. 2:04cr88). Abdi purportedly used that status to apply for a travel document to facilitate an act of international terrorism. See Indictment, United States v. Nuradin M. Abdi (S.D. Ohio 2004) (No. 2:04cr88). After he returned to the United States, he was charged with conspiring to provide material support to al Qaeda, and the Justice Department claims "that Abdi, along with admitted al Qaeda operative Iyman Ferris and other co-conspirators, initiated a plot to blow up a Columbus [Ohio] area shopping mall." Press Release of the United States Department of Justice, "Ohio Man Indicted for Providing Material Support to Al Qaeda, Falsely Obtaining and Using Travel Documents (June 14, 2004), at 2. The government has revoked his asylum because "with the exception of some minor biographical data, every aspect of [Abdi's] asylum application . . . was false." Government's Motion to Detain Defendant and Memorandum in Support at 4, United States v. Nuradin M. Abdi (S.D. Ohio 2004) (No. 2:04cr88).

Section 101 of Division B responds to terrorist abuse of our asylum laws by amending the INA to limit fraud.

As there are no explicit evidentiary standards for granting asylum in the INA, standards for determining the credibility of an asylum applicant and the necessity for evidence corroborating an applicant's testimony have evolved through the case law of the Board of Immigration Appeals (BIA) and federal courts. Because these standards are not consistent across federal appellate courts, different results have been reached in similar cases, depending on the court that hears the case.

With regard to sufficiency of the evidence, for example, the BIA and the federal courts agree that credible testimony alone may suffice to sustain the applicant's burden of proof in some cases, but disagree on when credible testimony alone can meet the burden and when corroboration is needed. The BIA has held that: "Because the burden of proof is on the alien, an applicant should provide supporting evidence, both of general country conditions and of the specific facts sought to be relied on by the applicant, where such evidence is available. If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must

162

ensure that the applicant's explanation is included in the record." *Matter of S–M–J–*, 21 I&N Dec. 722 (BIA 1997).

Section 101 resolves conflicts between administrative and judicial tribunals with respect to standards to be followed in assessing asylum claims. In addition, it makes similar amendments to the standards governing other forms of relief from removal. Finally, this section corrects references within the asylum provisions to reflect changes in the INA generally.

Authority: Subsection 101(a) of Division B would amend paragraph 208(b)(1) of the INA to clarify that the Secretary of Homeland Security and the Attorney General both have authority to grant asylum. Because both the Secretary of Homeland Security and the Attorney General may now exercise authority over asylum depending on the context in which asylum issues arise, paragraphs 101(a)(1) and (2) of Division B would accordingly amend paragraph 208(b)(1) of the INA to insert references to both the Attorney General and the Secretary of Homeland Security.

Paragraph 101(g)(1) of Division B would provide that the references to the authority of the Secretary of Homeland Security would take effect as if enacted on March 1, 2003, which was the official date of transfer of immigration enforcement functions from the INS to the Department of Homeland Security under the Reorganization Plan.

Burden of Proof and Central Reason: Paragraph 101(a)(3) codifies case law standards for granting asylum, both to resolve conflicts between fora and to codify precedential rules.

First, that paragraph would create a new clause 208(b)(1)(B)(i) in the INA. This clause codifies existing regulations and case law standards stating that the burden of proof is on the asylum applicant to establish eligibility as a refugee. This clause also will clarify the standard that an asylum applicant must meet to establish the motivation for persecution claimed.

The INA requires all aliens seeking asylum to establish that they suffered or fear persecution "on account of" one of five factors: race, religion, nationality, membership in a particular social group, or political opinion. As the Supreme Court has held: "since the statute makes motive critical, [an asylum applicant] must provide some evidence of it, direct or circumstantial." *INS* v. *Elias-Zacarias*, 502 U.S. 478, 483 (1992).

In explaining the Supreme Court's decision, the Ninth Circuit stated: "[I]n those cases in which a persecuted activity could stem from many causes, some protected by the statute and others unprotected, the victim must tie the persecution to a protected cause. To do this, the victim needs to show the persecutor had a protected basis (such as the victim's political opinion) in mind in undertaking the persecution." *Canas-Segovia* v. *INS*, 970 F.2d 599, 601 (9th Cir. 1992). The BIA has explained the alien's burden as follows: an asylum applicant "bear[s] the burden of establishing facts on which a reasonable person would fear that the danger arises on account of" one of the five protected factors. *Matter of Fuentes*, 19 I & N Dec. 658, 662 (BIA 1988).

The main issue in assessing motivation in an asylum context occurs in so-called "mixed motive" cases, where there is more than one possible motive for harm, one protected, others not. In requiring an asylum applicant to establish that at least one central rea-

163

son for persecution was or will be one of the five factors for asylum relief, this subsection calls for an evaluation of whether the protected characteristic is central to the persecutor's motivation to act.

Similar language has been advanced as a uniform standard for assessing motivation previously. In the proposed rule dealing with Asylum and Withholding Definitions (the so-called "R-A-" rule dealing with domestic violence cases), former Attorney General Janet Reno proposed to amend the asylum regulations to implement an almost identical proposal, explained as follows:

> This rule proposes new language . . . that would require an applicant to show that the protected characteristic is central to the persecutor's motivation to act. Consistent with current law, this language allows for the possibility that a persecutor may have mixed motives. It does not require that the persecutor be motivated solely by the victim's possession of a protected characteristic. It does, however, require that the victim's protected characteristic be central to the persecutor's decision to act against the victim. For example, under this definition it clearly would not be sufficient if the protected characteristic was incidental or tangential to the persecutor's motivation.

65 Fed. Reg. 76588, 76592 (Dec. 7, 2000).

Because this standard has not yet been adopted, there is currently no uniform standard for assessing motivation. This statutory standard is, however, in keeping with decisions of reviewing courts. See *Girma* v. *INS*, 283 F.3d 664, 668 (5th Cir. 2002) (affirming BIA's finding of no persecution on account of qualifying ground, because in mixed motive case "applicant . . . must present evidence sufficient for one to reasonably believe that the harm suffered was motivated in meaningful part by a protected ground"); *Ambartsoumian* v. *Ashcroft*, 388 F.3d 95, 91 (3d Cir. 2004) (applicant failed to show persecution on account of ethnicity, where police harassment was "mainly because he had failed to obtain proper legal documents and permission, and not because of his ethnicity"); *Useinovic* v. *INS*, 313 F.3d 1025, 1033 (7th Cir. 2002) (applicant failed to show persecution on account of political opinion based on robbery, where no showing that robbery "was primarily aimed at him personally and not at [stealing] valuables."). Ninth Circuit decisions in *Borja* v. *INS*, 175 F.3d 732 (9th Cir. 1999) and *Briones* v. *INS*, 175 F.3d 727 (9th Cir. 1999) and other cases have substantially undermined a proper analysis of mixed motive cases, however.

Adopting this standard will address another anomaly in the law that has been created by the Ninth Circuit, one that improperly favors asylum applicants who claim that they have been accused of engaging in terrorist, militant, or guerrilla activity. In *Singh* v. *Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995), the Ninth Circuit equated the "investigation of and reaction against those thought, rightly or wrongly, to be militants seeking the violent overthrow of the government" with "a classic example of imputed political opinion," rendering the applicant eligible for asylum. The court there also recognized a presumption of persecution on account of political opinion in the absence of evidence of what it

164

termed a "legitimate government prosecution" of a suspected mili-
tant. See id. at 1509 ("In this case, Singh was not the target of any
legitimate government prosecution. As in *Blanco-Lopez*, '[w]e find
no evidence in the record . . . that an actual, legitimate, criminal
prosecution was initiated against [the applicant.] *Blanco-Lopez* [v.
*INS*], 858 F.2d [531], 534 [(9th Cir. 1988)]. If 'there is no evidence
of a legitimate prosecutorial purpose for a government's harass-
ment of a person . . . there arises a presumption that the motive
for harassment is political.' *Hernandez-Ortiz* v. *INS*, 777 F.2d 509,
516 (9th Cir. 1985) ('When a government exerts its military
strength against an individual or a group within its population and
there is no reason to believe that the individual or group has en-
gaged in any criminal activity or other conduct that would provide
a legitimate basis for governmental action, the most reasonable
presumption is that the government's actions are politically moti-
vated.'")).

This presumption violates the Supreme Court precedent *Elias-
Zacarias*, which requires asylum applicants to provide evidence of
motivation. Further, this presumption effectively, but improperly,
shifts the burden to the government to prove either a "legitimate
purpose" for the foreign government's interest in the alien, or that
the alien's claim is not credible, or that the alien is barred from
asylum relief because, for example, that alien actually is a terrorist
or a persecutor.

Plainly, an alien who is a terrorist could more easily fabricate
a claim that his home government believes erroneously that he is
a terrorist. This is suggested by the case of Gazi Ibrahim Abu
Mezer, who was sentenced to life imprisonment for planning to
bomb the New York subway system in 1997. See *United States* v.
*Khalil*, 214 F.3d 111, 115 (2d Cir. 2000), cert. denied, 531 U.S. 937
(2000). Mezer was free in the United States after he was arrested
in Washington State by the Border Patrol, which initiated formal
deportation proceedings against him. Special Report of the United
States Department of Justice, Office of the Inspector General,
"Bombs in Brooklyn: How the Two Illegal Aliens Arrested for Plot-
ting to Bomb the New York Subway Entered and Remained in the
United States" (March 1998). While in proceedings, Mezer was re-
leased on a $5,000 bond and filed an application for political asy-
lum in the United States. Id. In his asylum application, Mezer
claimed that Israeli authorities had persecuted him because they
wrongly believed he was a member of Hamas. Id. In support of his
claim that Israel authorities had detained him twice without cause,
Mezer attached two documents from the International Committee
of the Red Cross. Id. One document reflected that Mezer was ar-
rested on July 31, 1990, and held for 42 days for a "security" viola-
tion. Id. The second document indicated that Mezer was arrested
on November 25, 1990, and held for approximately 90 days for "ad-
ministrative" reasons. Id.

According to the investigation of the case by the Justice De-
partment's Inspector General, the judge who received that applica-
tion "did not notice that Mezer had said he was suspected of being
a terrorist in Israel. She added that the assertion about Hamas, in
itself, was not persuasive evidence that Mezer was a terrorist or
that he should be detained, particularly because Mezer denied the
assertion and also because he returned for this hearing after he

165

had posted bond." Id. (emphasis added). The Inspector General continued:

INS trial attorneys whom we interviewed discussed some of the reasons that immigration judges do not normally detain aliens based only on their statements that they had been falsely accused of membership in a terrorist organization. First, they said that it was common for aliens to make such claims in support of asylum applications. INS Trial attorney Tammy Fitting estimated that on average, she saw one such claim each day during her work as a trial attorney.

Id. The burden that the government must bear in responding to such claims is compounded by two other issues. First, a regulation that bars the disclosure of information contained in an asylum application, or even the fact that an alien has applied for asylum, hinders the government's ability to confirm the veracity of asylum claims, or to obtain evidence that contradicts an alien's asylum claims. See 8 CFR § 208.6. Second, information that ties a specific alien to terrorism is likely to be classified. The use of classified information in section 240 removal proceedings is disfavored, however. See e.g., *Haddam* v. *INS,* 54 F. Supp. 2d 588, 598 (E.D.Va. 1999) ("The use of secret evidence against a party, evidence that is given to, and relied on, by the IJ and BIA but kept entirely concealed from the party and the party's counsel, is an obnoxious practice, so unfair that in any ordinary litigation context, its unconstitutionality is manifest.").

The "central reason" standard will eliminate this presumption, and require aliens who allege persecution because they have been erroneously identified as terrorists to bear the same burden as all other asylum applicants, that is, they will have to offer direct or circumstantial evidence of motive, in accordance with Supreme Court precedent.

Finally, with respect to so-called "mixed-motive" claims, under this amendment, asylum may be granted where there is more than one motive for mistreatment, as long as at least one central reason for the mistreatment is on account of race, religion, nationality, membership in a particular social group, or political opinion.

Corroboration and Credibility. Clauses 208(b)(1)(B)(ii) and (iii), added by paragraph 101(a)(3) of Division B, will bring clarity and consistency to evidentiary determinations by codifying standards for determining the credibility of applicant testimony, and determining when corroborating evidence may be required.

Corroboration: As a preliminary matter, new clause 208(b)(1)(B)(ii) of the INA codifies the BIA case law standard that the testimony of an asylum applicant can be sufficient to sustain the asylum applicant's burden of proof without corroboration, where the adjudicator determines that such testimony is credible, persuasive, and refers to specific facts demonstrating refugee status. Many aliens validly seeking asylum arrive in the United States with little or no evidence to corroborate their claims. This clause recognizes that a lack of extrinsic or corroborating evidence will not necessarily defeat an asylum claim where such evidence is not reasonably available to the applicant.

Codifying the BIA's corroboration standards, new clause 208(b)(1)(B)(ii) in the INA states that if an adjudicator determines

166

that an asylum applicant should provide corroborating evidence for otherwise credible testimony, such corroborating evidence must be provided unless the applicant does not have it and cannot reasonably obtain it. Although this provision makes it possible for an alien to prove eligibility for asylum without corroborating evidence, the inability to obtain corroborating evidence does not relieve the applicant from sustaining the burden of proof, that is, the alien must satisfy his burden through other evidence.

This provision is based upon the standard set forth in the BIA's decision in *Matter of S–M–J–*, 21 I&N Dec. 722. The BIA held there:

> Because the burden of proof is on the alien, an applicant should provide supporting evidence, both of general country conditions and of the specific facts sought to be relied on by the applicant, where such evidence is available. If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must ensure that the applicant's explanation is included in the record. Moreover, general country condition information may be necessary to support an applicant's testimony where the alien's claim is based on allegations which may be independently verified. "(W)hen the basis of an asylum claim becomes less focused on specific events involving the respondent personally and instead is more directed to broad allegations regarding general conditions in the respondent's country of origin, corroborative background evidence that establishes a plausible context for the persecution claim (or an explanation for the absence of such evidence) may well be essential."

Id. at 724 (internal citations omitted). With respect to evidence to support the applicant's specific claim, the BIA explained:

> Unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. That is, an asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification, such as evidence of his or her place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment. If the applicant does not provide such information, an explanation should be given as to why such information was not presented. . . . The absence of such corroborating evidence can lead to a finding that the applicant has failed to meet her burden of proof.

Id. at 725–26. Congress anticipates that the standards in *Matter of S–M–J–*, including the BIA's conclusions on situations where corroborating evidence is or is not required, will guide the BIA and the courts in interpreting this clause.

Credibility: Proposed new clause 208(b)(1)(B)(iii) of the INA codifies factors identified in case law on which an adjudicator may

make a credibility determination, including demeanor, candor, responsiveness, inherent plausibility of the account, consistency between the written and oral statements (regardless of when it was made and whether it was under oath, and considering the circumstances under which the statements were made), internal consistency of a statement, consistency of statements with the country conditions in the country from which the applicant claims asylum, and any inaccuracies or falsehoods in such statements. This section reiterates the rule that an asylum adjudicator is entitled to consider credible testimony along with other evidence.

Again, the creation of a uniform standard for credibility is needed to address a conflict on this issue between the Ninth Circuit on one hand and other circuits and the BIA. In *Elias-Zacarias*, 502 U.S. 478, the Supreme Court rejected the notion that a reviewing court may overturn a determination of the BIA in an asylum case whenever the court believes that the evidence supports a conclusion different from that of the BIA. It explained that "[t]o reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it." Id. at 481 n.1. Thus, an asylum applicant who "seeks to obtain judicial reversal of the BIA's determination . . . must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 483–484.

In 1996, as part of IIRIRA, Congress codified the principles that the Court articulated in *Elias-Zacarias*. Congress directed that a court of appeals reviewing an order of removal must confine its review to the administrative record before the agency and must accept the BIA's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Sections 242(b)(4)(A) and (B) of the INA.

This clause will allow Immigration Judges and the BIA to follow commonsense standards in assessing the credibility of asylum applicants better allowing them to identify and reject fraudulent claims. It should be noted, however, that although clause 208(b)(1)(B)(iii) would allow an adjudicator to base an adverse credibility determination on any of the factors set forth therein, such a determination must be reasonable and take into consideration the individual circumstances of the specific witness and/or applicant.

While the trier of fact is not required to state expressly that the trier has considered each factor in assessing credibility, Congress expects that the trier of fact will describe those factors that form the basis of the trier's opinion. This is true even where the trier of fact bases a credibility determination in part or in whole on the demeanor of the applicant.

Courts have recognized the expertise that Immigration Judges bring to this task. As the Ninth Circuit has held, for example: "An immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He is, by virtue of his acquired skill, uniquely qualified to decide whether an alien's testimony has about it the ring of truth." *Sarvia-Quintanilla* v. *INS*, 767 F.2d 1387, 1395 (9th Cir. 1985).

168

In assessing an applicant's demeanor for purposes of making a credibility assessment, Congress anticipates that triers of fact will rely on those aspects of demeanor that are indicative of truthfulness or deception. For example, in explaining why it "granted special deference to the IJ's eyewitness observations regarding demeanor evidence," the Ninth Circuit cited to an explanation that it had given "in the context of a similarly-situated administrative law judge," holding: "Weight is given to the administrative law judge's determinations of credibility for the obvious reason that he or she 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.' All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely." *Mendoza Manimbao* v. *Ashcroft,* 329 F.3d 655, 662 (9th Cir. 2003). As noted, a credibility determination should follow an examination of all relevant circumstances, including the circumstances of the individual applicant.

Finally, this provision makes it clear that there is no presumption of credibility, but if no adverse credibility determination is explicitly made, the applicant or witness has a rebuttable presumption of credibility on appeal.

Effective Dates. Paragraph 101(g)(2) would provide that the asylum standards established in paragraph 101(a)(3) of Division B shall take effect on the date of enactment and apply to asylum applications made on or after such date, therefore, the standards would not apply by statute to asylum applications filed before the date of enactment, although such standards in existing case law would apply.

Standards for Granting Withholding of Removal. Paragraph 241(b)(3) of the INA places restrictions on removal to a country where an alien's life or freedom would be threatened. Withholding is a form of protection similar to asylum, with some critical differences. Asylum is a discretionary form of relief, for which the standard is a "well-founded fear of persecution." Withholding of removal, on the other hand, is mandatory protection from removal for those who can satisfy the higher standard of a "clear probability of persecution," also expressed as "more likely than not" that an alien would be persecuted. There are other key differences between the two forms of relief. A person who has been granted asylum has been admitted into the United States, although the status is not a right to reside permanently in the United States. An alien who is granted withholding has not been granted legal entry into the United States and may be removed to his country when there is no longer any threat to his life or freedom. Withholding of removal is only specific to a particular country and therefore does not preclude removal to another country. An alien granted withholding of removal may not adjust to the status of a lawful permanent resident and the alien's family members are not eligible to come to the United States via the alien's status in the United States.

In contrast, an alien granted asylum may adjust status under subsection 209(b) of the INA after being present in the United States for one year after the grant of asylum if the alien still meets

169

the definition of refugee, is not firmly resettled in any other country and is otherwise admissible as an immigrant (with exemptions from certain grounds of inadmissibility). Additionally, under paragraph 208(b)(3) of the INA, the spouse and children of an alien granted asylum, if not otherwise eligible for asylum, may be granted asylum themselves if accompanying or following to join the alien. Aside from the higher standard for burden of proof, withholding of removal involves similar consideration of credibility and corroboration factors and some of the same issues regarding Ninth Circuit jurisprudence.

Subsection 101(c) of Division B would amend paragraph 241(b)(3) of the INA by applying to and codifying for withholding of removal applications the same standards for sustaining the applicable burden of proof and for assessing credibility that would be used for asylum adjudications under clauses 208(b)(1)(B)(ii) and (iii) of the INA, as added by paragraph 101(a)(3) of Division B.

Subsection 101(h)(2) of Division B would provide that the withholding of removal standards established in subsection 101(c) take effect on the date of enactment and apply to withholding applications made on or after such date. Accordingly, those standards would not apply by statute to applications filed before the date of enactment, although such standards in existing case law would apply.

Other Applications for Relief. Subsection 101(d) of Division B would add a new paragraph 240(c)(4) to the INA. This paragraph would apply the credibility and corroboration standards in section 101(a)(3) of Division B to other applications for relief and protection from removal. The new paragraph also codifies the current requirement that an alien applying for relief or protection from removal bears the burden of satisfying the eligibility requirements for that relief or protection, and also that he or she merits that relief as a matter of discretion, if the relief is discretionary.

Subsection 101(h)(2) of Division B would provide that the standards established in subsection 101(d) shall take effect on the date of enactment and apply to withholding applications made on or after such date. Accordingly, those standards would not apply by statute to applications filed before the date of enactment, although such standards in existing case law would apply.

Judicial Review of Corroboration Determinations: Subsection 101(e) of Division B would amend paragraph 242(b)(4) of the INA by establishing a specific standard of review for reversal of determinations concerning the availability of corroborating evidence by an adjudicator considering an application for asylum, withholding of removal, or other applications for relief or protection. This subsection would apply the prevailing standard of review for factual determinations in subparagraph 242(b)(4)(B) of the INA to determinations about the availability of corroborating evidence, itself a factual determination. This provision underscores that the appropriate standard of review for such determinations is the deferential factual review standard.

Subsection 101(g)(3) of Division B would provide that the standards established in subsection 101(e) shall take effect on the date of enactment and apply to all cases in which the final removal order was issued before, on, or after such date.

170

Clarification of Discretionary Relief Provision: Subsection 101(f) would amend subparagraph 242(a)(2)(B) of the INA by clarifying that the provision barring judicial review of denials of discretionary relief applies regardless of whether the discretionary judgment, decision, or action is made in removal proceedings. It also amends subparagraph 242(a)(2)(B) of the INA by adding reference to the Secretary of Homeland Security, to clarify the text and make it consistent with the aims of the Reorganization Plan for the Department of Homeland Security.

Subsection 101(g)(4) of Division B would provide that the amendments in subsection 101(f) shall take effect on the date of enactment and apply to all cases pending before, on, or after such date.

Removal of Caps. Section 209 of the INA currently provides that the Attorney General may adjust the status of aliens granted asylum to lawful permanent residence if they satisfy certain conditions, subject to a cap of 10,000 persons per fiscal year (aside from certain groups of asylees who are or have been exempt from the cap or subject to limits set in other legislation). Paragraph 101(g)(1) of Division B would eliminate the cap for adjustment of status for asylees. It would also replace references to the "Immigration and Naturalization Service" with references to the "Department of Homeland Security" and replace references to the "Attorney General" with references to the "Secretary of Homeland Security or the Attorney General."

Similarly, under section 207(a)(5) of the INA, not more than 1,000 aliens may be admitted as refugees or granted asylum under the provision of section 101(a)(42) therein relating to persecution for resistance to coercive population control methods. Paragraph 101(g)(2) would strike the limitation on grants under this provision.

Subsection 101(f), lifting these caps, shall take effect on the date¹ of enactment of Division B, pursuant to paragraph 101(g)(5).

Repeal of the Study and Report on Terrorists and Asylum. Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 provides that "the Comptroller General of the United States shall conduct a study to evaluate the extent to which weaknesses in the United States asylum system and withholding of removal system have been or could be exploited by aliens connected to, charged in connection with, or tied to terrorist activity," including the extent to which precedential court decisions may have affected the ability of the Federal Government to prove that an alien is a terrorist who should be denied asylum and/or removed.

Subsection 101(h) of Division B would repeal the requirement for the study and report, because the other provisions in section 101 of Division B would resolve the vulnerability of the asylum and withholding of removal systems to terrorist exploitation.

Section 102 of the conference agreement includes language modified from language proposed in section 102 of division B of the House bill. The Senate did not include similar language.

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 provides for construction and strengthening of barriers along U.S. land borders and specifically provides for 14 miles of barriers and roads along the border near San Diego, beginning at the Pacific Ocean and extending eastward. It provides

171

for a waiver of the Endangered Species Act of 1973 (ESA) and the National Environmental Policy Act of 1969 (NEPA) to the extent the Attorney General determines is necessary to ensure expeditious construction of barriers and roads. Despite the existing waiver provision, construction of the San Diego area barriers has been delayed due to a dispute involving other laws. The California Coastal Commission has prevented completion of the San Diego border security infrastructure because it alleges that plans to complete it are inconsistent with the California Coastal Management Program, a state program approved pursuant to the federal Coastal Zone Management Act (CZMA)—notwithstanding the fact that the San Diego border security infrastructure was designed to avoid and/or minimize adverse environmental impacts, and the Bureau of Customs and Border Protection (CBP) of the Department of Homeland Security testified before the California Coastal Commission that the plans for completion were consistent with the Coastal Management Program to the maximum extent practicable without sacrificing the effectiveness of the border security infrastructure. Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border, such as the Coastal Zone Management Act.

Current Law. Section 102(c) of IIRIRA provided for a waiver of the ESA and NEPA to the extent the Attorney General determines is necessary to ensure expeditious construction of barriers and roads.

Section 102 of the conference report would amend the current provision to require the Secretary of Homeland Security to waive all laws that he or she determines, in his or her sole discretion, are necessary to ensure the expeditious construction of the border barriers.

Additionally, it would prohibit judicial review of a waiver decision or action by the Secretary and bar judicially ordered compensatory, declaratory, or injunctive, equitable, or any other relief or other remedy for damage alleged to result from any such decision or action. As discussed above, current statutes and the Reorganization Plan for the Department of Homeland Security have not amended and clarified references to executive authority throughout the INA. Accordingly, the provision would have replaced the reference in current law to the Attorney General by a reference to the Secretary of Homeland Security.

The Conferees have revised the House provision in the following respects. First, the revised provision authorizes but does not require the Secretary of DHS to waive any legal requirements that he or she, in his or her sole discretion, determines are necessary to ensure expeditious construction of border security infrastructure. Second, the provision clarifies the intent of the conference report by substituting a reference to waiver of "all legal requirements" for the prior reference to waiver of "all laws", clarifying Congress' intent that the Secretary's discretionary waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure. Third, the conferees provided that any such waiver would become effective upon publication in the Federal Register, thereby ensuring appropriate public notice of such determinations.

172

Finally, the Conferees have provided federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution. The Conferees have further provided that such claims must be filed within sixty days of the Secretary's action or decision, and that interlocutory or final judgments, decrees, or orders of federal district courts on such claims may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States. The Conferees' intent is to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver.

Section 106 of the conference agreement includes language modified from language proposed in section 105 of division B of the House bill. The Senate did not include similar language.

Section 106 of Division B addresses a number of judicial review anomalies improperly favoring criminal aliens that were created by court decisions interpreting changes to the INA in 1996. Since 1961, Congress has consistently provided that only the courts of appeals may review removal orders. From 1961 through 1996, the INA provided that review in the courts of appeals "shall be the sole and exclusive procedure" for judicial review of deportation orders. See INA subsection 106(a) (1995) (entitled "Exclusiveness of procedure"). As the legislative history behind this provision reveals, Congress aimed to "create a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens from the United States." H.R. Rep. No. 1086, 87th Cong., 1st Sess., reprinted in 1961 U.S.C.C.A.N. 2950, 2966 (1961). Congress's "fundamental purpose" was "to abbreviate the process of judicial review of deportation orders" and to "eliminat[e] the previous initial step in obtaining judicial review—a suit in a District Court." *Foti* v. *INS*, 375 U.S. 217, 224 (1963); accord *Agosto* v. *INS*, 436 U.S. 748, 752–53 (1978); *Giova* v. *Rosenberg*, 379 U.S. 18 (1964) (per curiam). Thus, a final order of deportation could be challenged only in the appropriate court of appeals upon a timely filed petition for review.

Such order could not have been challenged in district court by way of habeas corpus. Although the INA contained another provision permitting habeas review, see INA § 106(a)(10) (1995), several circuits interpreted that provision as not providing habeas review over deportation orders, but only review over collateral issues, such as whether the alien should be released from custody or granted a stay of deportation pending a petition for review.

Moreover, to the extent that habeas review of deportation orders had been available before 1996, Congress attempted to eliminate it in enacting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104–132, 110 Stat. 1214 (April 24, 1996). One of the statute's provisions, entitled "Elimination of Custody Review by Habeas Corpus," expressly repealed the former habeas provision. See subsection 401(e), 110 Stat. 1268, repealing INA paragraph 106(a)(10) (1995). This was part of Congress's broad efforts to streamline immigration proceedings. Indeed, to expedite removal, section 440(a) of AEDPA precluded all judicial review of deportation orders for certain classes of criminal aliens. 110 Stat. 1276–77 (providing that such orders "shall not be subject to review by any court").

173

Congress continued these streamlining reforms when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, 110 Stat. 3546 (Sept. 30, 1996). In IIRIRA, Congress reestablished that only courts of appeals—and not district courts—could review a final removal order (or, to use the pre–1996 nomenclature, deportation order or exclusion order). See section 242(a)(1) of the INA (incorporating the Hobbs Act, 28 U.S.C. § 2347). In addition, Congress made clear that review of a final removal order is the only mechanism for reviewing any issue raised in a removal proceeding. Section 242(b)(9) of the INA (2000); see also IIRIRA § 309(c)(4)(A) (transition rules). Together, these provisions were intended to preclude all district court review of any issue raised in a removal proceeding. Finally, as it did in AEDPA, Congress confirmed that criminal aliens could not obtain any judicial review. IIRIRA expressly provided that, "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" one of various criminal offenses, including aggravated felonies. See section 242(a)(2)(C) (2000) (emphasis added); see also S. Rep. No. 104–249, 104th Cong, 2d Sess. at 7 ("Aliens who violate U.S. immigration law should be removed from this country as soon as possible.").

Despite Congress's efforts to limit judicial review in 1996, the Supreme Court expanded it just five years later. In *INS* v. *St. Cyr*, the Supreme Court held that criminal aliens are actually entitled to more review than they had before the 1996 amendments, and more review than non-criminal aliens. *INS* v. *St. Cyr*, 533 U.S. 289 (2001). Specifically, the Court held that criminal aliens could seek habeas review of their removal orders under 28 U.S.C. § 2241. With habeas review, the criminal alien would get review in district court and, on appeal, in the court of appeals.

The basis for the Court's decision was that Congress never "explicitly mention[ed]" section 2241 or habeas when it eliminated all judicial review over criminal aliens' removal orders. Id. at 312–13. According to the Court, an explicit reference to section 2241 or habeas was necessary because Congress did not provide for "another judicial forum" for criminal aliens to raise pure questions of law because, as noted, whereas non-criminal aliens could challenge their removal orders in the courts of appeals, under AEDPA and IIRIRA, criminal aliens could not. Id. at 298–300, 312–14; see also id. at 312 n.36 ("Congress" failure to refer specifically to § 2241 is particularly significant."). Thus, as a matter of statutory interpretation, the Court held that criminal aliens could bring habeas actions under section 2241.

The Court recognized that, as a result of its decision, criminal aliens would be able to seek review in district court and, on appeal, in the courts of appeals, whereas non-criminal aliens could obtain review only in the courts of appeals. It noted that Congress could fix this anomaly, however. As the Court stated, "Congress could without raising any constitutional questions, provide an adequate substitute [to section 2241] through the courts of appeals." Id. at 314. n.38.

Among the many problems caused by *St. Cyr*, the most significant is that this decision allows criminal aliens to delay their expulsion from the United States for years.

174

Furthermore, because of *St. Cyr*, aliens who have committed serious crimes in the United States are generally able to obtain more judicial review than non-criminal aliens. As the dissent in *St. Cyr* pointed out, allowing criminal aliens to obtain habeas review of their immigration orders in the district court "brings forth a version of the statute that affords criminal aliens more opportunities for delay-inducing judicial review than are afforded to non-criminal aliens, or even than were afforded to criminal aliens prior to the legislation concededly designed to expedite their removal." 533 U.S. at 327 (Scalia, J. dissenting). This is because, under *St. Cyr*, criminal aliens are able to begin the judicial review process in the district court, and then appeal to the circuit court of appeals. Criminal aliens thus can obtain review in two judicial forums, whereas non-criminal aliens may generally seek review only in the courts of appeals. Not only is this result unfair and illogical, but it also wastes scarce judicial and executive resources.

Finally, the result in *St. Cyr* has created confusion in the federal courts as to what immigration issues can be reviewed, and which courts can review them. The decision in *St. Cyr* itself held that district courts, and not the courts of appeals, have habeas corpus review authority over statutory claims involving discretionary immigration relief. See also *Calcano-Martinez* v. *INS*, 533 U.S. 348, 351–52 (2001). On the other hand, after *St. Cyr*, every circuit court has held that courts of appeals retain jurisdiction to review limited threshold "jurisdiction to determine jurisdiction" questions raised by criminal aliens in petitions for review. Therefore, following *St. Cyr*, some issues are still reviewable in the circuit courts while others are reviewable only in the district courts, resulting in bifurcated and inefficient review. Additionally, the circuits have split on the question of which court may entertain constitutional challenges to criminal aliens' removal orders (a question left open in *St. Cyr*). All of this has resulted in piecemeal review, uncertainty, lack of uniformity, and a waste of resources both for the judicial branch and Government lawyers—the very opposite of what Congress tried to accomplish in 1996.

Section 106 of Division B would address the anomalies created by *St. Cyr* and its progeny by restoring uniformity and order to the law. First, under this section, criminal aliens will have fewer opportunities to delay their removal, because they will not be able to obtain district court review in addition to circuit court review, and will not be able to ignore the thirty-day time limit on seeking review. Second, criminal aliens will not receive more judicial review than non-criminals. Under the amendments in section 106, all aliens will get review in the same forum—the courts of appeals. Third, by channeling review to the courts of appeals, section 106 will eliminate the problems of bifurcated and piecemeal litigation. Thus, the overall effect of the proposed reforms is to give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process.

Significantly, this section does not eliminate judicial review, but simply restores such review to its former settled forum prior to 1996. Under section 106, all aliens who are ordered removed by an immigration judge will be able to appeal to the BIA and then raise constitutional and legal challenges in the courts of appeals. No alien, not even criminal aliens, will be deprived of judicial re-

175

view of such claims. Unlike AEDPA and IIRIRA, which attempted to eliminate judicial review of criminal aliens' removal orders, section 106 would give every alien one day in the court of appeals, satisfying constitutional concerns. The Supreme Court has held that in supplanting the writ of habeas corpus with an alternative scheme, Congress need only provide a scheme which is an "adequate and effective" substitute for habeas corpus. See *Swain* v. *Pressley*, 430 U.S. 372, 381 (1977). Indeed, in *St. Cyr* itself, the Supreme Court recognized that "Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals." *St. Cyr*, 533 U.S. at 314 n.38 (emphasis added). By placing all review in the courts of appeals, Division B would provide an "adequate and effective" alternative to habeas corpus. Id.

Further, while the reforms in section 106 would preclude criminals from obtaining review over non-constitutional, non-legal claims, it would not change the scope of review that criminal aliens currently receive, because habeas review does not cover discretionary determinations or factual issues that do not implicate constitutional due process. See, e.g., *St. Cyr*, 533 U.S. at 306–07 & n.27 (recognizing that habeas courts do not review "exercise[s] of discretion" or "factual determinations" that do not implicate due process); *Fong Yue Ting* v. *INS*, 149 U.S. 698, 713–14 (1893) ("Congress might intrust the final determination of . . . facts to an executive officer"); *Heikkila* v. *Barber*, 345 U.S. 229, 236 (1953) ("the function of the courts has always been limited to the enforcement of due process requirements"); *Ter Yang* v. *INS*, 109 F.3d 1185, 1195 (7th Cir. 1997) ("the Supreme Court long ago made it clear that this writ does not offer what our petitioners desire: review of discretionary decisions by the political branches of government"); see also *Sol* v. *INS*, 274 F.3d 648, 651 (2d Cir. 2001) (habeas jurisdiction under § 2241 does not extend to factual or discretionary determinations).

Moreover, section 106 would not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders.

Review in the Courts of Appeals. Subparagraph 106(a)(1)(A) of Division B would replace habeas corpus review of specified removal orders with review of constitutional claims and questions of law before the courts of appeal.

It should be noted that the word "pure," in the phrase "pure question of law," which had appeared in prior versions of a proposed section 242(a)(2)(D) of the INA, has been deleted from that phrase in the final version in this subparagraph because it is superfluous. As the ACLU explained during the *St. Cyr* litigation, a "question of law" is a question regarding the construction of a statute. The word "pure" adds no meaning. The purpose of section 106(a)(1)(A)(iii) is to permit judicial review over those issues that were historically reviewable on habeas—constitutional and statutory-construction questions, not discretionary or factual questions. When a court is presented with a mixed question of law and fact, the court should analyze it to the extent there are legal elements, but should not review any factual elements. Factual questions include those questions that courts would review under the "substan-

176

tial evidence" or 242(b)(4)(B) standard, reversing only when a reasonable factfinder would be compelled to conclude that the decision below was erroneous.

Section 106(a)(1)(B) adds a new section 242(a)(4) to the INA. This provision will allow aliens in section 240 removal proceedings to seek review of "any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment" in the courts of appeal.

Section 106(a)(2) of Division B would amend section 242(b)(9) of the INA, concerning consolidation of issues for judicial review, to clarify that, except as otherwise provided in section 242 of the INA, no court is to have jurisdiction for habeas review or other non-direct judicial review of a removal order or questions of law or fact arising from such an order. This does not affect habeas corpus review in section 242(e)(2) of the INA. Subsection 242(g) of the INA, concerning exclusive jurisdiction, is also amended to clarify that no habeas review or other non-direct judicial review would be available for any claim arising from a decision or action by the Attorney General regarding the initiation and adjudication of removal proceedings or the execution of removal orders against any alien.

Under subsection 106(b), the effective date of the amendments in subsection 106(a) is the date of enactment of Division B, and the amendments would apply to cases in which the final administrative order of removal, deportation or exclusion was issued before, on, or after the date of enactment. Subsection 106(c) of Division B would provide for the transfer of pending habeas cases from district courts to federal appellate courts in which they could have been properly filed under section 242(b)(2) of the INA or the transitional rules of IIRIRA.

Subsection 106(d) provides that IIRIRA transition-rule cases filed under former subsection 106(a) of the INA (1995), concerning judicial review of deportation and exclusion cases and repealed by the IIRIRA, shall be treated as if they had been filed under section 242 of the INA and that such petitions shall be the sole avenue for judicial review of deportation or exclusion orders, notwithstanding any other provisions of law, including habeas review or other non-direct judicial review.

Finally, it should also be noted that section 106 will not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders.

## TITLE II—IMPROVED SECURITY FOR DRIVERS' LICENSES AND PERSONAL IDENTIFICATION CARDS

Section 201 of the conference agreement includes language modified from language proposed in section 201 of Division B of the House bill. The Senate did not include similar language.

Section 201 is necessary to clarify the Federal law as it pertains to driver's licenses, and relates it to other federal laws that govern state issuance and records keeping of "motor vehicle operator's license." That means that, to the degree that commercial truck driver's licenses and HAZMAT licenses are separately defined by Title 49, this law is directed to the personal driver's licenses and local use commercial vehicle licenses. It also names identification cards as being regulated, as every entity listed under the "State"

177

definition issues identity cards as well as driver's licenses. The Act establishes a minimum definition of "Official Purpose" to limit the use of any licenses or ID cards issued by states that do not meet the Act's requirements. More specifically, the definition provides direction as to what certain categories of temporary license marked clearly on their face to indicate they are not acceptable for federal identification or federal purposes and cannot be used. For example, non compliant driver's licenses or noncompliant state issued ID cards cannot be used for identification to board federally regulated commercial aircraft, enter nuclear power plants or have access to federally regulated critical infrastructure or similar facilities determined to be vulnerable to attack. Noncompliant driver's licenses or noncompliant state issued ID cards cannot be used for identification for any federal purpose. The Secretary is authorized to establish other purposes for which only those license and ID cards that meet federal standards can be used.

Section 202 of the conference agreement includes language modified from language proposed in section 202 of Division B of the House bill. The Senate did not include similar language.

202(a)(1) states that the law is binding on Federal agencies—not the states. Consequently, this Act does not directly impose federal standards with respect to states' issuance of driver's licenses and personal identification cards. The application of the law is indirect, and hence states need not comply with the listed standards. However, states would nevertheless need to adopt such standards and modify any conflicting laws or regulations in order for such documents to be recognized by federal agencies for official purposes. The Federal Government regulates driver's licenses issuance now for HAZMAT and commercial trucks, but not with regard to their physical security, counterfeit resistance or with regard to the confirmation of the identity of an applicant before license issuance. There is also federal regulation regarding Driving Under the Influence of alcohol, including requiring suspension of driving privileges, and provides grants to states for prevention programs. Federal law and regulations (23 CFR Chapter III) also provide detailed prescriptions for driver's safety training as a condition for issuance of licenses, and minimum standards for visual features to enable distinction between learner's permits and full validity driver's licenses. There is also a National Driver Register Problem Driver Point System, established by the National Driver Register Act of 1982. This Act established a mandate for states to share information about "bad drivers" through this system. Participation in the NDR is optional, conditioned by Federal grants. All 50 States and the District of Columbia participate in the NDR. The system is also referred to as the Problem Driver Pointer System (PDPS). Regulations governing participants require states to collect more information than required for the minimum document requirements under Section 202 as part of the license issuance process. However, the requirements for proof of identification to obtain a license are generalized. When the REAL ID Act becomes law, CFR 23 will need to be substantially revised by DOT to add details to the pertinent sections, as determined through the Department of Homeland Security established regulations implementing the Act. The primary process by which states will share information regarding the identi-

178

ties of driver's license holders will be the PDPS, once upgraded and with complimentary system capacity upgrading by the States.

202(a)(2). The Conferees revised HR 418, which placed compliance certification by the States under the authority of the Secretary of Homeland Security, based on certification by the Secretary of Transportation, so that the Secretary of Homeland Security will determine whether a state is complying with its certifications of compliance with the Act. This establishes a new channel of federal regulation and compliance audit by the Department of Homeland Security for identity management, while requiring coordination of regulations with the Department of Transportation (DOT) of driver's license regimes.

Section 202(b) Minimum Document Requirements. The intent of this requirement is to improve the ability of law enforcement officers at all levels to confirm the identity of the individuals presenting state issued driver's licenses or identification cards.

202(b)(1) Many states don't follow the convention of full legal name. For example, a person might "use" a middle name versus his/her first name, and therefore prefer that the driver's license use that name without regard to the "real" first name. Instead of William Beauford Brown, the state driver's license states simply "Beau Brown." Using a name other than a full legal name results in "no matches" when checked against other public records that use the full legal name. This occurred with some of the licenses and state ID cards obtained by the 9/11 terrorists, where the driver's license "names" were variants on the actual name carried in the passport, despite the terrorists' use of their own, valid passports to verify name.

202(b)(2) The person's date of birth is necessary to differentiate the person from others with the same name—for example, there are thousands of John R. Browns in the U.S., but very few have the same birthday. This is particularly relevant to protect people from being delayed at airports because their name coincides with someone on the "do not fly" list. Additional biographic information on the document most citizens present to board a plane will reduce problems with misidentification that currently plague our security processes.

202(b)(3) Gender is for all but a very few persons a clearly definable and verifiable biometric identifier. It allows law enforcement and airport security to quickly match or "no match" a person against a wants and warrant notification. Systematically employing it throughout the country would not only improve identification of suspected terrorists, it would expedite the checks on everyone else by reducing "false positives" where a person is erroneously matched by name with a wanted person.

202(b)(4) Currently every state does post a driver's license number on a permanent driver's license "card," but not all states employ traceable numbers on temporary licenses and temporary state ID cards. This is obviously an important tool in differentiating counterfeit licenses from valid licenses—via a number check.

202(b)(5) requires a digital photograph of the person so that it can be confirmed by comparison to the current and/or future database of the State issuing the license, using existing secure technology designed for that purpose. More than 20 states continue to

179

use a process where "regular" photos are glued into license forms. These are easily altered by breaking the plastic seal, and replacing the valid photo with one of the person who has stolen or "borrowed" the license or ID card from the person to whom it was validly issued. The intent of requiring a digital photo, as in a passport, is to insure that the photo accurately captures the appearance of the person to whom it was issued. It also allows the state to retain a record of the digital image at a relatively low cost, and be able to provide that image to law enforcement quickly via a computer link.

202(b)(6) Having the person's principal residence address is, in fact, a standard requirement in nearly all states, but many states make no effort to verify that it is the principal residence, and not an address of convenience, or a completely irrelevant address selected at random by the applicant. In this last case, the applicant has normally provided a false address to avoid apprehension for a crime, or notification by law enforcement regarding a civil award. Many scofflaw fathers hide their current location to avoid paying child support, as required by federal law.

202(b)(7) requires a person's signature, so that it can be compared to a person's signature when using the card for identity confirmation for both civil, legal and regular financial transactions, as to verify a credit card signature. Signature verification is another means for a law enforcement officer to confirm identity, and is actually of convenience to retail establishments to confirm check and credit card signatures.

202(b)(8) requires physical security features to prevent tampering, counterfeiting or duplication of the document for fraudulent purposes. The importance of this requirement cannot be overstated. A majority of states maintain a high level of physical security in the manufacture of their cards. Unfortunately, a significant minority of states do not issue licenses or ID cards with secure physical characteristics. This results in criminals, identity thieves, and amateurs such as college students being able to "manufacture" fake driver's licenses and ID cards from these states. Federal law enforcement officials—national forensic document laboratory—can validate that the driver's licenses of these states are not secure from counterfeiting using easily available technology.

202(b)(9) A common machine-readable technology exists, along with common defined minimum data elements, under the interstate driver's compact to which 46 states already belong. There is inconsistency in actual practice with regard to the order of the data. Further, there has been little research on methods to secure the privacy of the data contained on the machine readable strip. Improvements in the machine readable technology would allow for less data being present on the face of the card in the future, with other data stored securely and only able to be read by law enforcement officials.

Section 202(c) Minimum Issuance Standards. The 9/11 Commission report recommended that the federal government correct the chronic weakness among many of the states in the verification of identity for issuance of licenses. That recommendation has been supported by other reports on criminal justice, drunk driving, and underage drinking, albeit for entirely different objectives. Current federal regulations addressing driver's licenses require the states to

180

obtain a date of birth for each applicant, but states set their own criteria for what kind of document they can rely on for the DOB. Consequently, the Commission staff report noted that it's similarly easy for a terrorist, or for a tourist, entering the U.S. on a valid visa, to build a "document chain" beginning with a counterfeit or an altered document. Precisely because we have many legal immigrants, States rarely check the authenticity of "green cards" or other immigration documents. Which is why 9–11 terrorist Mohammad Atta was able to pass a hand altered immigration document to get a 6 year Florida's driver's license despite holding what was, in fact, a visa that was about to expire. Once implemented, it will also address the problem in which high school and underage college students obtain authentic driver's licenses in states other than ones they grew up in, with a false age that allows them to go into bars and consume alcohol. The provision will establish minimum issuance standards for federal recognition requiring that before a state can issue a driver's license or photo identification card, it would have to verify with the issuing agency, the issuance, validity and completeness of: (1) a photo identification document or a non-photo document containing both the individual's full legal name and date of birth; (2) date of birth; (3) proof of a social security number (SSN) or verification of the individual's ineligibility for a SSN; and (4) name and address of the individual's principal residence. A comparable, but more loosely defined set of identity verification requirements pertaining to minimum requirements for NDR inquiries are stated in CFR 23, 1327.5 to be "Proof of identification—Acceptable forms of identification are driver's license, birth certificate, credit card, employee identification card, and other forms of identification normally accepted by the State." The new requirements do not "preempt any state verification standards" but require that the state establish a common minimum set of standards. Nothing in the law limits a state's prerogative to use other supplementary forms of identity confirmation, nor to use a much lower standard for the issuance of learner's permits or other driving permits that are not eligible to be used for identification purposes by federal agencies. For those forty states who have public policy positions and corroborating state law that establish minimum identity confirmation standards and a legal presence requirement, the standards will provide a common platform.

202(c)(2)—Special Requirements. This requires a state, before issuing a driver's license or identification card to a person, to require a person to present valid documentary evidence that he or she is either a U.S. citizen or national or an alien legally present in the United States. CRS has noted that there are no special requirements relating to the issuance of identification cards to persons who are not U.S. citizens but are nonetheless U.S. nationals (i.e., most residents of American Samoa or Swain's Island). That will not be necessary within the Act, as the Secretaries of DHS and DOT will accordingly address those special categories of U.S. nationals (a U.S. citizen or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States").

For those states electing to conform to the requirements of this Act, so that their driver's licenses will be accepted for identification purposes by the federal government, this set of requirements estab-

181

lishes the basis for a common statutory basis for subsequent federal regulations.

202(c)(2)(B) The evidence of Legal Status requirements conform almost exactly to those of the laws of the Commonwealth of Virginia, and are parallel to the state laws of New York, Florida, California and roughly thirty other states which have passed laws requiring evidence of lawful presence in the United States. It requires for state license and ID cards verification that an applicant is lawfully present (not present in violation of the Immigration and Naturalization Act) in the United States before issuing a driver's license or personal identification card that is intended to be used for identification purposes by federal agencies. Under this section, persons would only be eligible for temporary drivers' licenses or identification cards if evidence is presented that they: (1) have a valid, unexpired non-immigrant visa or non-immigrant visa status for entry into the United States; (2) have a pending or approved application for asylum in the United States; (3) have entered into the United States in refugee status; (4) have a pending or approved application for temporary protected status in the United States; (5) have approved deferred action status; or (6) have a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.

202(c)(2)(C) This establishes that, in order to issue temporary licenses or temporary ID cards that will be acceptable to the federal government for identification purposes, a state may only issue a temporary driver's license or identification card with an expiration date equal to the period of time of the applicant's authorized stay in the United States. Clause ii provides that if there is an indefinite end to the period of authorized stay, the card's expiration date shall be one year. The temporary card shall clearly indicate that it is temporary and shall state the expiration date. Clause iii provides for clear display of the expiration date on a temporary card, which is an extremely important requirement for the benefit of public safety and security personnel, police and others who need to inspect people for entry to airports, secure facilities, and for official federal purposes, as defined in the act and by subsequent regulations. A clear display facilitates an expedited inspection, and a clear date to determine validity of the temporary licenses. Clause iv provides that renewals of the temporary cards would be done only upon presentation of valid documentary evidence that the status had been extended by the Secretary of Homeland Security. This is important because renewals of temporary licenses were exploited by the 9/11 terrorists, and have been a major security vulnerability with foreign visitors who decide to overstay their valid visa terms.

202(c)(3)(B) The requirement that licenses for ID purposes for foreign visitors not be issued except when the applicant's identity is confirmed by a passport is intended to strengthen the identify confirmation process for foreign visitors, and to stop the process of accepting unreliable foreign documents for identification. Should an applicant who is not a U.S. citizen or immigrant otherwise meet the identification standards set out in the bill, a State must only provide a temporary license or certificate limited to one year's duration and clearly marked as not for identification, with the notifi-

182

cation to the holder that it is not valid for federal identification or official federal purposes.

202(c)(3)(C) The Act, for purposes of validating states' determination of lawful presence requires that all States enter into a memorandum of understanding with the Secretary of Homeland Security to routinely utilize the automated system known as Systematic Alien Verification for Entitlements, to verify the legal presence status of a person, other than a United States citizen or national, applying for a driver's license or identification card.

Section 202(d) Other requirements are each new procedural standards to be addressed by regulations to be established by DHS under the Act.

202(d)(1) Obtaining and retaining digital images of applicants will assist in expediting applicant identity confirmation for license and ID card renewal process. It will also assist with preventing fraud, and facilitate those states using photo comparison software to identify such frauds, and safeguard against identity theft.

202(d)(2) requires states to keep records of source documents (birth certificates, etc.) for at least 7 years primarily to allow for renewal of driver's licenses without requiring license holders to bring back identity confirming documents. It also establishes a minimum duration during which documentation is available to law enforcement officers investigating and prosecuting suspected identity concealment by criminals and terrorists, as well as obtaining proof and assistance with identity theft crimes. This corrects a current problem in which states don't retain records at all, or destroy them after a few months, hence destroying both the audit trail of proof of valid documents needed to issue a license, as well as fraudulent documents used by law breakers until subsequently discovered by investigators. Although the FBI has provided the counts now used about the false identities maintained by the 19 9–11 terrorists, they may in fact have had more, as state records systems are sometimes so poor that few source documents are available to confirm or deny. The goal is to move all the state's records into electronic format, with each state consolidating electronic records otherwise maintained at County level at the State level. The cost is much lower than the paper filing system still maintained by some States. The initial capital cost for the state is not insignificant, but the incremental savings are great. Although this Act will require licenses be re-issued after every eight years, states will need to have original document records to discern whether the birth certificate was valid that was originally presented when the prior license was issued. The Social Security Administration is pursuing a birth certificate records system with the States that is beginning to have an effect in a few pilot states, which program will be further accelerated by the program put into law through the Intelligence Reform Act that will reduce the state's need to retain a separate record of document images or paper records.

202(d)(3) The requirement to photograph each applicant has as its purpose capturing a recorded photograph of applicants who may be denied a license for insufficient documents or documents that are recognized as fraudulent. This will primarily act as a deterrent to attempted fraud, once the public becomes aware of this new procedure, since frauds and others using false identities will understand that their photograph will be available to law enforcement

183

even if they are denied a license or ID card. It is a particularly important tool for federal law enforcement investigating suspected terrorism and identity theft.

202(d)(4) The requirement to establish an effective procedure to confirm or verify a renewing applicant's information will establish a qualitative floor standard to correct the current problem in some states where license and ID card renewal is done without adequate confirmation of identity of the applicant. Those inadequate procedures are both a source of identity theft and a vulnerability that terrorists might exploit.

202(d)(5) imposes an important requirement to correct a current practice of many states in which multiple driver's licenses with multiple names are allowed to use the same reference Social Security Number as the "reference" SSN to confirm identity. In the event that a SSN is already registered to or associated with another person to which any state has issued a driver's license or identification card, the state shall resolve the discrepancy and take appropriate action. The need for this requirement is illustrated by what was found in Virginia and in New York State when state laws in each were changed post 9/11. In 2002, when Virginia began reconciling SSNs with the Social Security Administration, it found the SSNs of more than a quarter million of its license holders were "non-matches" with the Social Security Administration's records. Similarly New York State found hundreds of thousands of similar license holders in its database.

202(d)(6) corrects the current security vulnerability of state procedures where a license or ID card issued by another state is replaced with a new license or ID card without confiscating the "old" card or notifying the other state of the new issuance. Several of the 9/11 terrorists told the issuing states that they had lost their licenses so that they could have two valid licenses, and then used the duplicate to obtain a license in another state, allowing them to hold 'multiple licenses from multiple states. This practice of obtaining multiple licenses in multiple states is also routinely exercised by criminals and bad drivers for their respective illegal purposes, which this requirement will correct.

202(d)(7) requiring improved physical security, addresses a growing problem of identity thieves and documents purveyors breaking into state facilities and stealing license stock blanks, printing machines, and sometimes actual computer hard drives in which current license holder data is stored.

202(d)(8) subjects state personnel and contractors employed by the states who produce the driver's licenses to security clearance requirements. Investigations of driver's license insider corruption in Virginia, New Jersey and other states in the past three years revealed that a routine security investigation would have prevented key perpetrators from ever being employed to handle documents of high "street" value that can be sold to illegal aliens, criminals, terrorists, and identity thieves.

202(d)(9) requires states to train employees to detect fraud "before it happens" to reduce vulnerability to terrorists, identity thieves, alien smugglers and illegal aliens with false documents and "bad driver" frauds. A few states do this now, and all states need to do this to improve the integrity of the license issuing process.

184

202(d)(10) limits the term of validity of driver's licenses and ID cards to establish a maximum term, to address the current vulnerability to identity thieves who steal or purchase the valid driver's license, and then assume the identity of a dead person or someone who has left the state, and go undiscovered for an indefinite period.

202(d)(11) provides for those categories of special licenses issued by states for local or temporary purposes where the identity of the applicant cannot be assured, or for whom lawful presence is not determined. Examples of such licenses or Florida licenses issued as valid only for "in state" purposes, and certificates of driving privileges issued by Tennessee and Utah, for which the applicants cannot meet the identity confirmation requirements of the Act. Subparagraph A establishes the requirement that such documents and/or cards be clearly marked as not accepted for federal identification. The provision will allow the state to meet the terms of this act with regard to its non-standard licenses, provided DHS confirms its certification that its procedures don't provide any "back doors" to licenses or ID cards that are intended to be valid for federal identification or federal purposes. Subparagraph B requires a unique design or color indicator such as a special colored border so that federal officials can quickly recognize it is not valid for federal identification or federal purposes.

202(d)(12) requires each state to be able to electronically access information contained in other states' motor vehicle databases. DHS will be expected to establish regulations which adequately protect the privacy of the holders of licenses and ID cards which meet the standards for federal identification and federal purposes. DHS regulations pertaining to the overall security of state databases to safeguard them from unauthorized access or any criminal abuse are not required by this Act because DHS is already subject to privacy protection standards through other federal laws pertaining to cyber security.

202(d)(13) The requirement for states to maintain a motor vehicle database that contains all data fields printed on driver's licenses and identification cards is directed at those states which currently don't store adequate records to allow other states to confirm the validity of the original issues. This requirement is primarily to address identity management minimum standards, and to support the goal of "only one license for one driver." This provision in both parts will correct a significant problem that has led to some states refusing to provide reciprocity to other states with regard to both adequate data and assurance of driver safety, particularly with regard to Driving Under the Influence citations.

Section 203 of the conference agreement includes language modified from language proposed in section 204 of division B of the House bill. The Senate did not include similar language.

Section 203. This section amends 18 U.S.C. § 1028(a)(8), which makes it a federal crime to transport, transfer, or otherwise dispose of to another, materials or features used on a document of the type intended or commonly used for identification purposes. By replacing the phrase "false identification features" with "false or actual authentication features," this provision clarifies the scope of the criminal provision, making it a crime to traffic in identification features regardless of whether the feature is false. In addition, section 203(b) requires that the Secretary of Homeland Security enter con-

185

viction information into the appropriate aviation screening database. This provision should improve the security of the clearance process while reducing incidents of travelers being delayed because of similar names with people on the "do not fly" watch list.

Section 204 of the conference agreement includes language modified from language proposed in section 205 of division B of the House bill. The Senate did not include similar language.

Section 204 provides grants to states under the discretion of the Secretary of Homeland Security. This will require DHS to establish a process for grant requests, and the time table under which states will need to meet the requirements of the regulations. Some states are already in compliance with nearly all of the standards established by the act, and it will be incumbent upon DHS to recognize that grants should be only used to assist those states which cannot otherwise meet the minimum standards by the end of 2009. DHS will also need to establish internal certification procedures so that grants awarded are spent for the purposes identified. This provision also authorizes the Secretary to request funds and assign personnel for the administration of this Act through the normal process.

Section 205 of the conference agreement includes language modified from language proposed in section 206 of division B of the House bill. The Senate did not include similar language.

Section 205 requires the Secretary of Homeland Security to consult with the Secretary of Transportation and with the states in the process under which DHS issues regulations, sets standards, and issues grants under this title. This provision establishes that the Secretary, consistent with the Administrative Procedures Act, will follow a conventional regulatory notice procedure, including the established interagency notification regime, and will not engage in any other form of rulemaking, such as negotiated rule making.

Section 205 also allows the Secretary of DHS to grant an extension of time only to meet the requirements of section 202(a)(1), which means that all states must meet standards established by the regulation with a uniform deadline for their respective driver's licenses and ID cards to be used for Federal identification and federal purposes.

Section 206 of the conference agreement includes language modified from language proposed in section 207 of division B of the House bill. The Senate did not include similar language.

Section 206 also repeals overlapping and potentially conflicting provisions of the Intelligence Reform and Terrorism Prevention Act of 2004.

Section 207 of the conference agreement includes language modified from language proposed in section 208 of division B of the House bill. The Senate did not include similar language.

Section 207 provides a normal limitation on statutory construction to preserve the authorities and responsibilities of the Secretary of Transportation.

## TITLE III—BORDER INFRASTRUCTURE AND TECHNOLOGY INTEGRATION

Section 301 of the conference agreement includes language modified from language proposed in section 301 of division B of the House bill. The Senate did not include similar language.

186

Section 301 requires the Under Secretary of Homeland Security for Border and Transportation Security, in consultation with the Under Secretary of Homeland Security for Science and Technology and the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, to study the technology, equipment, and personnel needed by field offices of the Bureau of Customs and Border Protection to address security vulnerabilities within the United States, and conduct a follow-up study at least once every five years thereafter. The Under Secretary of Homeland Security for Border and Transportation Security is required to submit a report to Congress of findings and conclusions from each study, along with legislative recommendations for addressing security vulnerabilities. Section 301(c) authorizes necessary appropriations for fiscal years 2006 through 2011 to carry out recommendations from the first study.

Section 302 of the conference agreement includes language modified from language proposed in section 302 of division B of the House bill. The Senate did not include similar language.

Section 302 requires the Department of Homeland Security to establish a pilot program to identify and test ground surveillance technologies to enhance border security. The program would cover both northern and southern border locations. It also requires DHS to submit a report to designated House and Senate committees within a year of program implementation describing the program and recommending whether it should terminate, be made permanent, or be enhanced.

Section 303 of the conference agreement includes language modified from language proposed in section 303 of division B of the House bill. The Senate did not include similar language.

Section 303 requires the Secretary of Homeland Security, in consultation with various federal, state, local, and tribal agencies, to develop and implement a plan to improve interagency communication systems and enhance information-sharing on matters related to border security on the federal, state, local, and tribal level. DHS would submit a report to designated House and Senate committees within a year of plan implementation which would include any recommendations that the Secretary of Homeland Security found appropriate.

### TITLE IV—TEMPORARY WORKERS

The conference agreement includes language modified from language proposed by the Senate regarding numerical limits for H2–B visas for certain nonimmigrant workers. The House did not include similar language.

### TITLE V—OTHER CHANGES TO PROVISIONS GOVERNING NONIMMIGRANT AND IMMIGRANT VISAS

The conference agreement includes language modified from language proposed by the Senate regarding reciprocal visas for national of Australia. The House did not include similar language.

The conference agreement includes language modified from language proposed by the Senate regarding visas for nurses. The House did not include similar language.

187

The conferees agree to the Senate amendment relating to the title of the Act. The Senate amended the title to read "An Act Making Emergency Supplemental Appropriations for Defense, the Global War on Terror, and Tsunami Relief, for the fiscal year ending September 30, 2005, and for other purposes.".

JERRY LEWIS,
C. W. BILL YOUNG,
RALPH REGULA,
HAROLD ROGERS,
FRANK R. WOLF,
JIM KOLBE,
JAMES T. WALSH,
CHARLES H. TAYLOR,
DAVID L. HOBSON,
HENRY BONILLA,
JOE KNOLLENBERG,
JOHN P. MURTHA,
NORMAN D. DICKS,
ALAN B. MOLLOHAN,
PETER J. VISCLOSKY,
CHET EDWARDS,
*Managers on the Part of the House.*

THAD COCHRAN,
TED STEVENS,
PETE V. DOMENICI,
CHRISTOPHER S. BOND,
MITCH McCONNELL,
RICHARD C. SHELBY,
JUDD GREGG,
ROBERT F. BENNETT,
LARRY CRAIG,
KAY BAILEY HUTCHISON,
MIKE DEWINE,
SAM BROWNBACK,
WAYNE ALLARD,
ROBERT C. BYRD,
DANIEL K. INOUYE,
PATRICK LEAHY
    (with exception for REAL
    ID),
TOM HARKIN
    (with exception for REAL
    ID),
BARBARA MIKULSKI
    (with exception for REAL
    ID),
HARRY REID
    (with exception for REAL
    ID),
BYRON L. DORGAN
    (with res.—conference did
    not reconvene),
DIANNE FEINSTEIN

188

(with exception for REAL
ID),
TIM JOHNSON,
MARY LANDRIEU,
*Managers on the Part of the Senate.*

○

**ATTACHMENT B**



U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

**Sanders, Richard, Esquire**
**20 PARK PLAZA**
**SUITE 633**
**BOSTON, MA  02116-0000**

**Office of the District Counsel/BO**
**P.O. Box 8728**
**Boston, MA  02114**

**Name: VIVAS-CHACON, LEONIDES***          **A74-588-341**

<u>D</u>ate of this notice: 06/16/2005

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

Frank Krider
Chief Clerk

Enclosure

Panel Members:
    OSUNA, JUAN P.

**U.S. Department of Justice**                    Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041
========================================================================

File:   A74-588-341 - Boston                        Date:

In re:  VIVAS-CHACON, LEONIDES*
                                                    JUN 1 6 2005
IN DEPORTATION PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:  Sanders, Richard, Esquire


ORDER:

    PER CURIAM.  The respondent has appealed from the Immigration Judge's decision dated
March 11, 2005.  In her decision, the Immigration Judge denied the respondent's motion to reopen
his removal proceedings in which he was ordered removed in absentia on July 15, 1997.  The appeal
will be dismissed.

    The Immigration Judge properly denied the respondent's motion.  The respondent concedes that
the Immigration Judge told him the date of his hearing and personally provided him with a written
Notice of Hearing.  Such verbal and written notice is proper notice in accordance with sections
239(a)(1) and (2) of the Immigration and Nationality Act.  Since the respondent received proper
notice in accordance with sections 239(a)(1) and (a)(2) of the Act, the Immigration Judge properly
denied respondent's motion to reopen.  8 C.F.R. § 1003.23(b)(4)(ii).  In his Notice of Appeal, the
respondent alleges "exceptional circumstances" in the form of a heart condition.  However, the
respondent's motion to reopen based on an "exceptional circumstance" is untimely as it was filed
nearly 8 years after the respondent's July 15, 1997, in absentia order of removal.  See 8 C.F.R. §
1003.23(b)(4)(ii).  We further decline to reopen and administratively close the respondent's
proceedings so that he may apply for temporary protected status (TPS) because this Board does not
reopen and administratively close proceedings which involve aliens who are potentially eligible for
TPS.

    Finally, we find no reason to reverse the Immigration Judge's decision based on the respondent's
contention offered for the first time on appeal that changed circumstances have arisen in El Salvador.
8 C.F.R. § 1003.2(c)(3)(ii).  Normally, we do not consider new evidence offered for the first time on
appeal.  Even if we were to consider the new evidence filed with the respondent's appeal, we cannot
conclude that the new facts and evidence by themselves, in that the respondent and his siblings are
engaged in an ongoing dispute with his step-siblings for various reasons, establish a legitimate nexus
between the harm alleged and one of the grounds enumerated in the Act.  See generally INS v. Elias-
Zacarias, 502 U.S. 478 (1992).  Rather, the harm the respondent alleges appears to be nothing more
than a family feud.  We, therefore, find that the respondent has failed to demonstrate prima facie
eligibility for the underlying relief sought.  Matter of L-O-G-, 21 I&N Dec. 413, 419 (BIA 1996).
Based on the foregoing, we concur with the Immigration Judge's decision to deny the respondent's
motion.  See Matter of Coelho, 20 I&N Dec. 464 (BIA 1992) (finding that a motion to reopen
proceedings may be denied where a prima facie case for the relief sought has not been established).

    Accordingly, the appeal is dismissed.

                            _____
                            FOR THE BOARD